**ARIZONA POWER AUTHORITY et al., Plaintiffs-Appellants,**

Electrical District No. 2, Pinal County, Arizona, Intervenor-Plaintiff-Appellant,

v.

Rogers C. B. MORTON, Individually and as Secretary of the United States Department of the Interior, and Ellis L. Armstrong, Individually and as Commissioner of the Bureau of Reclamation, United States Department of the Interior, Defendants-Appellees.

Northern Division Power Association, Inc., Intervenor-Defendant-Appellee.

No. 75-2141.

United States Court of Appeals, Ninth Circuit.

Jan. 17, 1977.

Rehearing and Rehearing En Banc Denied March 28, 1977.

---

**1232**

Melvin Richter (argued), Washington D. C., for plaintiffs-appellants.

Robert L. Klarquist, U. S. Dept. of Justice, Washington, D.C., for defendants-appellees.

George K. Fadel (argued), Bountiful, Utah, for intervenors-defendants-appellees.

Before BROWNING and WALLACE, Circuit Judges, and FERGUSON,[*] District Judge.

WALLACE, Circuit Judge:

Water is the precious lifeblood of the Southwest.[1] In recognition of this fact,

Congress has authorized several extensive projects for the development of the water resources of the Colorado River Basin, the principal drainage system of the region. One of these projects is authorized by the Colorado River Storage Project Act (CRSP), ch. 203, 70 Stat. 105 (1956), *as amended,* 43 U.S.C. §§ 620 *et seq.* A critically important incident of the damming and construction of storage reservoirs along the upper Colorado River pursuant to CRSP is the generation of hydroelectric power. We are called upon in this case to determine if and when the exercise of the Secretary of the Interior's authority under CRSP to contract for the sale of hydroelectric power is judicially reviewable.

On March 9, 1962, the Secretary of the Interior (Secretary) issued General Power Marketing Criteria (Marketing Criteria) which allocated the greater part of the power generated at CRSP hydroelectric plants to public utilities in the states of Colorado, Utah, New Mexico and Wyoming. Arizona Power Authority and eight other Arizona public utilities (referred to jointly as Arizona Power) brought suit against the Secretary[2] challenging this geographic preference. Both Arizona Power and the Secretary moved for summary judgment. In support of its motion and in opposition to the Secretary, Arizona Power contended first that the implementation of the geographic preference was beyond the Secretary's authority and, second, assuming that it was within his authority, that the Marketing Criteria were arbitrary and unreasonable as a matter of law. Arizona Power also argued that there were material issues of fact in dispute on its second contention that precluded granting the Secretary's motion for summary judgment. The district court rejected these arguments and granted

---

[*] Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

1. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); Lichtenstein, Fight for Water in West Grows, N.Y. Times, Aug. 22, 1976, § 1, at 1, col. 2; *cf. United States v.*

*Tulare Lake Canal Co.,* 535 F.2d 1093 (9th Cir. 1976).

2. The Commissioner of the Bureau of Reclamation was also named a party defendant. The suit sought declaratory and injunctive relief.

summary judgment in favor of the Secretary.[3]

On appeal, the Secretary specifically articulates a new argument: the issuance of the Marketing Criteria was agency action committed to agency discretion by law and thus not judicially reviewable under the Administrative Procedure Act § 10, 5 U.S.C. § 701(a)(2). We agree and therefore vacate the judgment of the district court.

## I. Factual Background

CRSP was enacted with reference to several interstate compacts and federal reclamation projects which involve the Colorado River Basin. As a result, CRSP is complex and its interpretation presents difficult issues that can be highlighted by briefly outlining federal and multi-state activity in the basin.

### A. The Law of the Colorado River

Comprehensive development of the Colorado River Basin requires the cooperation of seven states. The Colorado River begins in the mountains of Colorado and flow southwesterly for approximately 1,400 miles through Colorado, Utah, Arizona, along the Arizona-Nevada and Arizona-California boundaries before entering Mexico and emptying into the Gulf of California. Tributaries originating in Wyoming, Colorado, Utah, Nevada, New Mexico and Arizona define the boundaries of the basin, which comprises an area about 900 miles long from north to south and 300 to 500 miles wide from east to west—approximately one-twelfth the area of the contiguous United States. The basin is arid and has historically been dependent upon water management practices in order to be productive and inhabitable. H.R.Rep. No. 1312, 90th Cong., 2d Sess. 5–6 (1968), reprinted in 1968 U.S.C.Cong. & Admin.News, pp. 3666, 3671–72; Arizona v. California, 373 U.S. 546, 552, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).

With the rapid settlement and development of the basin at the end of the nineteenth century it became clear that small scale diversion works would not be sufficient to provide a dependable year-round water supply. The erratic nature of the river flows which could bring either drought or flood, the problem of land erosion and silt deposits, and the physical impediments of deep canyons and long distances from river to community were barriers too great for small groups of farmers or even individual states to surmount. It was soon recognized that the task of constructing storage dams, canals and various irrigation and power works required the economic and engineering resources of the federal government.[4]

While the prospect of federal intervention and funding was appealing to all of the basin states, it brought to the forefront the competition between the upper and lower basin states for the beneficial use of Colorado River water. Because the prevailing water law of the western states was prior appropriation, rather than riparian rights or equitable allotment, rights to Colorado River water would likely be based on a "first in time, first in right" principle.[5] The upper basin states thus feared that the surplus

---

**3.** The Secretary initially argued that the action was barred under the doctrines of laches and estoppel, but withdrew these issues from consideration for purposes of deciding the cross-motions for summary judgment. The Secretary had also argued that the United States had not waived its sovereign immunity with respect to this action, but this jurisdictional defense was apparently withdrawn before the grant of summary judgment and the district court did not reach the issue. Neither were these issues raised on this appeal.

**4.** A report on irrigation possibilities in the Imperial Valley stated: "The control of the floods and development of the resources of the Colorado River are peculiarly national problems . . . ." S.Doc. No. 142, 67th Cong., 2d Sess. 1 (1922). The report concluded that these "problems are of such magnitude as to be beyond the reach of other than national solution." Id.

**5.** See Wyoming v. Colorado, 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999 (1922) (prior appropriation rule given interstate effect); Nebraska v. Wyoming, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945) (same).

waters stored by federal projects would initially be diverted to the more rapidly growing lower basin states, principally California, and thereby permanently appropriated to the exclusion of any future use to meet increased demands in the upper basin states. The states therefore agreed to negotiate an interstate compact for allocation of the water.[6] Congress consented to the negotiations, Act of August 19, 1921, ch. 72, 42 Stat. 171, and in 1922 the states completed an agreement termed the Colorado River Compact. 70 Cong.Rec. 324 (1928) (text of agreement).

The Compact failed to allocate the waters on a state-by-state basis but did achieve a compromise position. The basin was divided into two parts at Lee's Ferry, a point on the Colorado River in northernmost Arizona. Art. II(e)–(g). What is referred to as the upper basin is drained by the Colorado River and its tributaries above Lee's Ferry and includes parts of Wyoming, Colorado, Utah, New Mexico and the northeast corner of Arizona. The Compact defines the lower basin as parts of Nevada, California, New Mexico, Utah and substantially all of Arizona.[7] The upper and the lower basin were each apportioned the exclusive beneficial consumptive use of 7,500,000 acre-feet of water a year. Art. III(a).[8]

The Compact did not at first achieve the required unanimous ratification by the seven states because of Arizona's failure formally to approve.[9] Congress nevertheless consented to the Colorado River Compact and waived the seven-state approval requirement of the Compact when it enacted the Boulder Canyon Project Act (BCPA). Ch. 42, §§ 4(a) & 13, 45 Stat. 1058, 1064 (1928), 43 U.S.C. §§ 617c(a) & 617*l*(a). California and five states approved the Compact pursuant to the conditions of the BCPA, and the BCPA thereafter became effective by presidential proclamation. 46 Stat. 3000 (1929).[10]

Section 1 of the BCPA, 43 U.S.C. § 617, authorized the Secretary to construct a Boulder or Black Canyon Dam[11] and other projects in the lower basin for flood control,

6. An interstate compact had not previously been used for the apportionment of waters of an interstate stream. H.R.Rep. No. 1312, *supra,* at 7, *reprinted* in 1968 U.S.C.Cong. & Admin.News, p. 3673.

7. The Compact also divided the basin into two other parts: states of the *upper division*—Colorado, Utah, Wyoming and New Mexico—and states of the *lower division*—Arizona, California and Nevada. Art. II(c) & (d). Arizona lies within both the upper and lower basins but is a state of only the lower division. This distinction in terminology is the cause of considerable confusion in the legislative history of CRSP.

The Marketing Criteria allocated the power on a geographic basis, using a northern and southern division terminology that is similar to the upper and lower division scheme of the Compact. The Marketing Criteria treat Arizona as a southern division state. The text of CRSP adopts both the upper basin and upper division terminology of the Compact, § 16, 70 Stat. 111, but at the same time refers to the development of water resources for the benefit of "States of the Upper Basin," § 1, 70 Stat. 106, while defining that term to include Arizona, § 16, 70 Stat. 111. As described *infra,* we think that CRSP was designed principally for the benefit of four upper basin states—Colorado, Utah, Wyoming and New Mexico, *i. e.,* the upper (northern) division states—and not for

the benefit of the fifth upper basin state, Arizona.

8. Because the annual volume of Colorado river water varies significantly, Art. III(d) prohibited the upper division states from causing the water at Lee's Ferry to be depleted below an aggregate of 75,000,000 acre-feet for any period of ten consecutive years.

9. The allocation of water between the lower basin states of California and Arizona remained a disputed issue, as did Arizona's claim that its tributaries (principally the Gila River) should not be required to contribute to water obligations the United States owed to Mexico. *Hearings on H.R. 5773 Before the Subcomm. on Irrigation and Reclamation of the House Comm. on Interior and Insular Affairs,* 70th Cong., 1st Sess. 30–31, 402–05 (1928). These issues were eventually resolved in Arizona's favor in the Boulder Canyon Project Act, ch. 42, § 4(a), 45 Stat. 1058 (1928), 43 U.S.C. § 617c(a).

10. The Colorado River Compact was subsequently ratified by Arizona in 1944 H.R.Rep. No. 1312, *supra,* at 10, *reprinted in* 1968 U.S.C. Cong. & Admin.News, at 3676.

11. The dam was at one time called Boulder Dam but is now titled Hoover Dam, Act of April 30, 1947, ch. 46, 61 Stat. 56.

reclamation and production of hydroelectric power. Importantly, the BCPA resulted in an allocation of mainstream waters among the lower basin states of Nevada, California and Arizona.[12] This allocation had the effect of facilitating development of lower basin water resources by removing an issue of controversy among the lower basin states.[13]

Lower basin development proceeded at a rapid pace. The lakes behind Parker Dam and Davis Dam [14] on the lower Colorado River joined Lake Mead behind Hoover (Boulder) Dam [15] as major storage reservoirs. These projects provide water and power for large metropolitan areas (such as Los Angeles and San Diego) and extensive agricultural districts in southern California and Arizona. S.Rep. No. 1983, 83d Cong., 2d Sess. 2 (1954).

Development in the upper basin, however, moved more slowly. The erratic flow of the river, fluctuating between periods of drought and flood, made it impractical to meet the annual 7,500,000 acre-feet obligation to the lower basin states without river control on a long-term holdover basis. The necessity of holdover storage reservoirs was accentuated by the fact that the periods of high flows do not occur when the demands for the water are greatest. Without such

reservoirs, development in the upper basin was limited to small irrigation projects usually constructed by private groups. H.R. Rep. No. 1774, 83d Cong., 2d Sess. 10–11 (1954).

A significant barrier to comprehensive upper basin development was overcome by ratification of the Upper Colorado River Basin Compact in 1948.[16] This compact apportioned among the states of Arizona, Colorado, New Mexico, Utah and Wyoming the consumptive use of waters allocated to the upper basin by the Colorado River Compact. Over 99 per cent of the upper basin allotment was divided among the so-called upper division states [17] of Colorado, New Mexico, Utah and Wyoming.[18] This apportionment made possible the Colorado River Storage Project Act in 1956. *See Friends of the Earth v. Armstrong,* 485 F.2d 1, 4–6 (10th Cir. 1973), *cert. denied,* 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974).

CRSP provided a plan for long-term development. It authorized construction of a number of projects for flood control, reclamation and extended irrigation, municipal and industrial water needs, and hydroelectric power. A series of holdover storage reservoirs with hydroelectric plants, transmission facilities, and incidental works were authorized. The legislation also established

12. The provisions of § 4(a) of the BCPA authorized Arizona, California and Nevada to enter into a compact to divide the lower basin share of 7,500,000 acre-feet of mainstream waters so that California would receive 4,400,000 acrefeet a year, Arizona 2,800,000, and Nevada 300,000 with California and Arizona each getting one-half of any surplus. 43 U.S.C. § 617c(a). Although the three states never agreed to such a compact, the Supreme Court construed § 4(a), together with § 5 which grants the Secretary authority to contract for the sale of water, as indicating a congressional intent to apportion the lower mainstream waters in the same ratio as that described in the authorized, but never executed, tri-state compact. *Arizona v. California, supra,* 373 U.S. at 564–65, 83 S.Ct. 1468.

13. While certain provisions of the BCPA remained to be interpreted in the *Arizona v. California* litigation, *supra,* California had already agreed to be limited to a minimum of 4,400,000 acre-feet a year. California Limitation Act, Cal.Stat.1929, ch. 16, at 38. The Supreme

Court in *Arizona v. California* decided how any surplus waters would be measured and apportioned.

14. *See* Act of May 28, 1954, ch. 241, 68 Stat. 143 (consolidation of the two dam projects).

15. *See also* Boulder Canyon Project Adjustment Act, ch. 643, 54 Stat. 774 (1940), *as amended,* 43 U.S.C. §§ 618 *et seq.*

16. Congress consented to the Upper Basin Compact. Act of April 6, 1949, ch. 48, 63 Stat. 31.

17. *See* note 7, *supra.*

18. Under the Upper Basin Compact, Arizona receives 50,000 acre-feet annually. The excess is apportioned among the other states as follows: Colorado, 51.75 per cent; Utah, 23 per cent; Wyoming, 14 per cent; and New Mexico, 11.25 per cent. Art. III(a), 63 Stat. 32.

priorities for planning and constructing additional reclamation works that would serve as participating projects. §§ 1–2, 43 U.S.C. §§ 620–620a. In regulating the flow of the upper Colorado for beneficial consumptive uses and for the generation of hydroelectric power,[19] all authorized projects were to be operated in conformity with the law of the Colorado River—*i. e.*, the Colorado River Compact, Upper Colorado River Basin Compact, Boulder Canyon Project Act, Boulder Canyon Project Adjustment Act, and certain other agreements. §§ 1, 7, 9, 14, 43 U.S.C. §§ 620, 620f, 620h, 620m.

Four hydroelectric facilities subject to the CRSP Marketing Criteria have already been constructed. The largest is Glen Canyon Dam on the Colorado River just below the Utah-Arizona border and north of Lee's Ferry. Flaming Gorge Dam in Utah is located on the Green River just below the Wyoming-Utah border. The Curecanti unit is composed of three dams and reservoirs on the Gunnison River in Colorado: Blue Mesa and Morrow Point Dams, both completed, and Crystal Dam, presently under construction. The Glen Canyon and Flaming Gorge dams and the Curecanti units will have a combined firm electric power[20] generating capacity of about 1,260,000 kilowatts, with Glen Canyon having the largest capacity, 900,000 kilowatts. The Bonneville unit of the Central Utah participating project, which is yet to be constructed, is also included in the CRSP Marketing Criteria.[21]

Although CRSP describes the generation of hydroelectric power as "an incident" of the storing of water for flood control, reclamation and other consumptive uses, § 1, 43 U.S.C. § 620, power production is nevertheless a principal purpose of the legislation. H.R.Rep. No. 1774, *supra*, at 11; *cf. Friends of the Earth v. Armstrong, supra*, 485 F.2d at 4, 6. Congress intended CRSP hydroelectric power to serve not only as an energy source for the ever-increasing demands of the upper basin area but also as a revenue producer that would repay the federal investment in the power features of the project. Indeed, surplus power revenues were projected to help reimburse the costs of CRSP attributable to irrigation features and to aid in funding an Upper Colorado River Basin Fund that would defray the costs of basic units and participating projects of CRSP. §§ 5, 6, 13, 43 U.S.C. §§ 620d, 620e, 620*l*. Congress considered power revenues to be the most important financial aspect of CRSP.[22]

---

**19.** Consumptive usage of water is usually measured by the amount of diversion less return. In the generation of electrical energy the water used is returned to the river and therefore is not considered a consumptive use.

**20.** Firm energy is dependable energy and is calculated on the basis of anticipated stream flow. Secondary or dump energy is undependable energy that is created by waters in excess of the anticipated stream flow.

**21.** Congress has enacted additional legislation for the further development of the upper basin. *See, e. g.*, Navajo Indian Irrigation Project, Pub.L. 87–483, 76 Stat. 96 (1962), 43 U.S.C. §§ 615ii *et seq.*; Fryingpan-Arkansas Project, Pub.L. 87–590, 76 Stat. 389 (1962), 43 U.S.C. §§ 616 *et seq.*; Colorado River Basin Project, Pub.L. 90–537, 82 Stat. 886 (1968), 43 U.S.C. §§ 1501 *et seq.*

**22.** Power revenues over a fifty-year period were projected to reach a total of $1,075 million. This sum would return the $442.7 million capital investment in power facilities and the interest on that investment, about $320 million. It would also repay the non-interest-bearing cost attributable to the construction of irrigation works that would not be repaid by irrigation users' fees ($282.8 million minus $36.6 million). Interest on the construction charges for irrigation features are not reimbursable as a general policy of federal reclamation law. *Cf.* Act of May 25, 1926, ch. 383, § 46, 44 Stat. 649, *as amended*, 43 U.S.C. § 423e; Act of Aug. 4, 1939, ch. 418, § 9(d)–(e), 53 Stat. 1193, *as amended*, 43 U.S.C. § 485h(d)–(e); H.R.Rep. No. 1774, *supra*, at 11–12. CRSP likewise adopts this policy. *See* § 5(d), 43 U.S.C. § 620d(d).

Congress thought municipal water revenues sufficient to return the municipal water allocation of $41 million with interest. After the CRSP cost outlay of $760 million, § 12, 43 U.S.C. § 620k, has been completely reimbursed, net power revenues are expected to total $15 million to $20 million annually. Thus, in the long run, power revenues will not only ensure the return of the federal investment, but will also return a profit that can fund other works in the upper basin. H.R.Rep. No. 1087, 84th Cong., 1st Sess., pt. 1, 8–13 (1956), *reprinted in* 1956 U.S.C.Cong. & Admin.News, pp. 2346, 2354–59.

Power generated by CRSP facilities is sold by the Bureau of Reclamation to power utilities who in turn wheel and sell the power to the ultimate consumers. CRSP provides two general guidelines for the sale of power. The first is set out explicitly in Section 7 of the Act: CRSP plants are to be operated "so as to produce the greatest practicable amount of power and energy that can be sold at firm power and energy rates" consistent with the law of the Colorado River. 43 U.S.C. § 620f. The second guideline is referred to in Section 4 of the Act: absent exculpatory provisions, CRSP plants are to be operated in conformity with federal reclamation law. 43 U.S.C. § 620c. Section 4 therefore incorporates Section 9 of the Reclamation Project Act of 1939, ch. 418, 53 Stat. 1193, 43 U.S.C. § 485h(c).

This section of the Reclamation Project Act (§ 485h(c)) imposes a number of restrictions on the marketing of power. It defines a class of "preference" customers who shall have the first opportunity to purchase hydroelectric power generated by federal reclamation projects. This class of preference customers comprises:

> municipalities and other public corporations or agencies and . . . cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural Electrification Act of 1936.

*Id.* The priority accorded to public utilities (preference customers) is by now an important aspect of federal reclamation projects. Section 485h(c) also sets a maximum term of forty years for contracts for the sale of power or lease of power privileges and sets out criteria for rate-making. Furthermore, Section 485h(c) forbids the making of any contract relating to electric power or power privileges "unless, in the judgment of the

Secretary, it will not impair the efficiency of the project for irrigation purposes." Neither Section 7 of CRSP nor Section 485h(c) makes any reference to the impermissibility of geographic preferences in the sale of power.

### B. Formulation of the Marketing Criteria

Shortly after the enactment of CRSP, the Federal Power Commission began survey of markets and transmission facilities for CRSP hydroelectric power. The region selected for study included Colorado, New Mexico, Utah, Wyoming, Arizona, the southern part of Nevada, and small portions of Idaho and Texas. Representatives of preference customers in Colorado, New Mexico, Utah, Wyoming and Arizona assisted in supplying data. The survey, entitled "Power Market Survey—Colorado River Storage Project" (Market Survey), was completed in June 1958.

The Bureau of Reclamation submitted recommendations based upon Market Survey data to the Secretary in a May 1960 memorandum. Bureau of Reclamation, Memorandum to Secretary of the Interior re Colorado River Storage Project (May 3, 1960) (1960 Memorandum). This memorandum proposed that the primary marketing area for CRSP power be the "northern division" states of Wyoming, Colorado, Utah and New Mexico. Because preference customers in these states did not need all of the CRSP power, however, the memorandum recommended that the excess be sold to preference customers in the "southern division" states of Arizona, California and Nevada.[23] Power sold in this secondary marketing area was to be withdrawn as needed by preference customers in the northern division. The memorandum proposed, however, that the southern division

---

**23.** Supplying power from CRSP projects to the lower basin states would require an intertie between CRSP transmission lines and the transmission lines of the Hoover Dam and Parker-Davis projects in the lower basin. In addition to facilitating interim use of CRSP power, the interties would increase overall efficiency of Colorado River Basin power marketing be-

cause the peak load in the southern division occurs in the summer (July) while the peak load in the northern division occurs in the winter (December). Thus, power from lower and upper basin projects could be marketed to meet the peak loads of the respective divisions on a year-round basis. 1960 Memorandum, *supra*, at 10–12.

receive a minimum allocation of 7 per cent of CRSP output in the winter months and 20 per cent in the summer.

In recommending this geographic preference, the memorandum took into account those portions of the legislative history of CRSP which declared that all Colorado River Basin states should be on the "same basis" with respect to acquiring power. *See* Section II, D *infra*. It noted, however, "that no definite instructions as to the market area were specified by the Congress in the legislation itself." It also gave "considerable weight" to the fact that power from the large Hoover Dam and Parker-Davis Projects was already committed to the lower basin states. The memorandum concluded that "the over-all, closer balance among the states of the Colorado River Basin, that would result [from the recommended geographic preference], would achieve a more desirable result [than pro rata division among all the states]." 1960 Memorandum, *supra*, at 13.

The Marketing Criteria announced on March 9, 1962, by Secretary Stewart Udall follow generally the policy set forth in the 1960 Memorandum. Preference customers

in the southern division states are guaranteed a minimum of 20 per cent of summer CRSP power and 7 per cent of the winter supply. Until the northern division preference customers need their full allotments, the excess power is to be marketed in the southern division, subject to withdrawal on three years' notice.[24] As a condition for acquiring CRSP power, southern division customers must acknowledge the principle of withdrawal.[25]

The Secretary sent application forms for the purchase of CRSP power to all prospective preference customers in both divisions. The forms contained a clause acknowledging the Secretary's discretionary authority to withdraw power allotments. Arizona Power Authority returned its forms with this clause stricken and was refused power allotments. Subsequent negotiations to allot power to the Authority as a pooling agent for the ultimate customers terminated after the Bureau negotiated contracts directly with the Authority's customers. Eight of the nine plaintiffs subsequently entered into contracts acknowledging the principle of withdrawal. A total of 27 southern division customers and 58 north-

24. The Marketing Criteria provide in part:
Recapture, at any time, after not less than three years advance notice, of firm power and energy under contract to preference customers in the Southern Division; provided that recapture will cease when commitments of firm power and energy in the Southern Division have been reduced to amounts not exceeding in the aggregate 7 per cent of project capability during the winter season and 20 per cent of project capability during the summer season, or such respective amounts as determined by the following adjustment procedure. The winter maximum of 7 per cent of project capability may be adjusted downward, and the summer maximum of 20 per cent may be adjusted upward by an amount equal to the downward adjustment, as the difference between the summer and winter peak loads of the Northern Division increases above 13 per cent of project capability. There will be no adjustment to increase the Southern Division winter minimum of 7 per cent or reduce the Southern Division summer maximum of 20 per cent if the difference between winter and summer loads of the Northern Division decreases below 13 per cent of project capability. The

total amount of the recapture will be spread proportionately among all preference customers of the Southern Division unless the customers themselves agree in advance on some other methods not adverse to the interests of the United States . . . .. Project capability is defined for the purposes of withdrawal as the dependable capacity (reduced by transmission losses to delivery points) of storage project powerplants as determined by the Bureau from reservoir elevations. *Id.*, § 4(D)(3).

25. The Marketing Criteria provide in part:
Prior to initiation of construction of transmission lines into the Southern Division, or in the alternative, of arrangements for delivery of power to customers in that Division by other means, specific assurances shall be obtained from prospective customers in the Southern Division that the principle of withdrawal set out in subsection D(3) of this Section 4 will be applicable to allotments to, and contracts for, the sale of power to such customers.
*Id.* § 4(D)(4).

ern division customers entered into contracts with the Bureau of Reclamation.[26]

After execution of the contracts, the Bureau offered to sell to the eight plaintiffs all the power needed to satisfy their customers' requirements. In December 1970, however, the Bureau notified all of its southern division customers that it would give notice not later than March 1973 that power in excess of the summer 20 per cent minimum would likely be withdrawn beginning with the 1976 summer season. The withdrawal would decrease the power allocated to the southern division from approximately 335,058 to 252,000 kilowatts.

### C. The Trial Court Proceedings

In June 1971 Arizona Power Authority met with the other plaintiffs and they jointly decided to protest the proposed withdrawal as illegal and beyond the Secretary's authority. Seven of the plaintiffs who had contracted with the Bureau then notified the Secretary that they would contest any withdrawal of power. Arizona Power Authority, on behalf of the contracting customer plaintiffs, also informed the Secretary of its intention to contest the legality of the geographic preference policy of the Marketing Criteria.

This suit was filed by Arizona Power[27] in December 1971 seeking an injunction and declaratory judgment against the Secretary and the Commissioner of the Bureau of Reclamation.[28] The district court granted summary judgment for the Secretary in May 1975. This appeal followed.[29]

---

**26.** The number of utilities receiving power is actually higher since some of the contracting customers are pooling associations which represent a number of other preference customers.

**27.** Seven of the plaintiffs joined the Authority in filing the complaint. On August 3, 1973, the district court filed an order granting the motion of Electrical District No. 2, Pinal County, to intervene.

### II. Jurisdiction
### A. Judicial Review of Administrative Action

The first question before us is whether we have jurisdiction to review the action of the Secretary in this case. The Secretary contends on appeal that the formulation of the geographic preference in the Marketing Criteria is unreviewable agency action. He relies on the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), which precludes judicial review of "agency action . . . committed to agency discretion by law." In short, the Secretary contends that the courts are without jurisdiction to interfere with his decision.

The provision upon which the Secretary relies, § 701(a)(2), states a narrow exception to judicial review applicable only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1970). If "there is no law to apply," there are no issues susceptible of judicial resolution, and accordingly the courts are denied jurisdiction over the matter. *See* K. Davis, Administrative Law Text § 28.05, at 515–16 (3d ed. 1972). In deciding whether agency action is committed to agency discretion by law, it is not significant that there may be law, in the abstract, that could possibly be applied. *Strickland v. Morton*, 519 F.2d 467, 470 & n.4 (9th Cir. 1975). Instead, we must determine whether in this particular case there is any specific law to apply. *Citizens to Preserve Over-*

---

**28.** The district court granted Northern Division Power Association, Inc., representing 58 preference customers in the northern division, leave to intervene as a defendant.

**29.** We ordered the Secretary to maintain the status quo of CRSP power deliveries to Arizona Power pending completion of our review.

*ton Park, Inc. v. Volpe, supra,* 401 U.S. at 410, 91 S.Ct. 814. As we stated in *Strickland v. Morton, supra,* 519 F.2d at 470, another case examining the scope of § 701(a)(2):

> When a court is asked to review agency action in instances where considerable discretion is committed by statute to an official, the court lacks jurisdiction due to the provisions of § 701(a)(2) only when the agency action of which plaintiff complains fails to raise a legal issue which can be reviewed by the court by reference to statutory standards and legislative intent. Where a statute grants broad discretion to an administrative official, absent some action *clearly* contradictory to a statutory provision or legislative intent . . . a plaintiff challenging an exercise of that discretion may find it an all but insurmountable task to be able to bring his case within this standard, but unless he does so § 701(1)(2) deprives the courts of jurisdiction to entertain his case.

(emphasis in original, citations omitted). *See also Ness Investment Corp. v. United States Department of Agriculture,* 512 F.2d 706, 714–15 (9th Cir. 1975); *Bronken v. Morton,* 473 F.2d 790, 794, 797 (9th Cir. 1973); *Ferry v. Udall,* 336 F.2d 706, 712 (9th Cir. 1964), *cert. denied,* 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286 (1965).

Thus, the issue before us is whether Congress has provided a legal standard that we may apply in reviewing the Secretary's formulation of the geographic preference in the Marketing Criteria. If Congress has not provided such a standard but has rather granted broad discretion to the Secretary, the Secretary's action, unless "clearly contradictory to a statutory provision or legislative intent," is not reviewable by us.

### B. Scope of the Secretary's Discretion

 It is apparent that Congress has imposed some restrictions on the Secretary's discretion to market hydroelectric power. Section 7 of CRSP requires that plants be operated with other federal power plants "to produce the greatest practicable amount of power . . . that can be sold at firm power . . . rates."[30] Section 7 also requires the Secretary to observe the compacts and statutes comprising the "law of the Colorado River." Further, the use of water for generating hydroelectric power "shall [not] preclude or impair the appropriation of water for domestic or agricultural purposes pursuant to applicable State law." In addition, Section 485h(c) of the Reclamation Project Act sets a minimum rate and defines a class of preference customers who have priority in purchasing power. *Arizona Power Pooling Association v. Morton,* 527 F.2d 721, 726–28 (9th Cir. 1975).

Had Arizona Power alleged that the Secretary violated any of these restrictions, we would have jurisdiction to review his action. *See Arizona Power Pooling Association v. Morton, supra,* 527 F.2d at 726–28. But Arizona Power makes no such allegation.[31]

Within the restrictions just outlined, it appears that the Secretary has considerable discretion. For example, the Supreme

---

**30.** We note that we have construed the phrase "the most feasible plan," in a grant of authority to the Secretary to plan a project for the acquisition of power needed for irrigation pumping, as endowing the Secretary "with almost unlimited authority in orchestrating all phases of the project." *Arizona Power Pooling Ass'n v. Morton,* 527 F.2d 721, 727 (9th Cir. 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). However, there the Secretary had the option of recommending the construction of power plants and purchase of hydroelectric and thermal power from non-federal interests. Colorado River Basin Project Act, Pub.L. 90–537, § 303(a)–(b), 82 Stat. 889 (1968), 43 U.S.C. § 1523(a)–(b). Here the Secretary is delegated only the authority to operate the already constructed federal power plants so as to produce the greatest possible amount of firm power; accordingly, his discretion may be somewhat narrower.

**31.** Arizona Power suggests that the Secretary has not contracted for the sale of the greatest practical amount of firm power. It alleges that 102,070 of the 1,007,000 kilowatts of power allocated to the northern division has not been contracted for sale. This suggestion is groundless. The 102,070 kilowatts of power have not been sold because it is to be generated from Crystal Dam and Morrow Point power plant facilities which are not yet generating power.

Court has held that rates for the sale of power above a defined minimum (*see* 43 U.S.C. § 485h(c)) are to be set "in the Secretary's judgment" and contracts for sale may be made for any term less than 40 years. *City of Fresno v. California,* 372 U.S. 627, 631–32, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963). Also, although it is true that Section 485h(c) forbids the Secretary from making any contract for the sale of power that would "in [his] judgment . . . impair the efficiency of the project for irrigation purposes," *id.* at 630, 83 S.Ct. at 998, we have held that this grant of discretion is broad enough to permit the Secretary to bypass the preference customer priority when sales to preference customers would impair project efficiency. *Arizona Power Pooling Association v. Morton, supra,* 527 F.2d at 727. Further, the Supreme Court has also said that the "general authority to make contracts normally includes the power to choose with whom . . . the contracts will be made." *Arizona v. California, supra,* 373 U.S. at 580, 83 S.Ct. at 1487.[32]

Unless Arizona Power can establish its contention that Congress has prohibited the Secretary from taking a customer's location into account in marketing CRSP power, it would appear in light of his broad discretion that the Secretary may adopt whatever geographic preference he desires and that we have no jurisdiction to review his action.

### C. Text of CRSP

Turning first to the text of CRSP, we find no prohibition of geographic preferences. It is clear that if Congress wanted to specify a geographic basis for disposition of hydroelectric power it knew how to do so. The same Congress that enacted CRSP also authorized the Secretary to construct a Trinity River Division of the Central Valley Project of California. Act of Aug. 12, 1955, ch. 872, 69 Stat. 719. Section 4 of that act specifically requires that preference customers in Trinity County receive 25 per cent of the power generated by the Trinity River Division.[33] Thus, if Congress had desired in the text of CRSP to allot Arizona or the lower basin states a specified amount of power, it had a recent precedent to guide it.[34] No such explicit prohibition of geographic preferences appears, however, nor does Arizona Power allege that the geographic preference is inconsistent with any of the explicit statutory restrictions on the Secretary's discretion. We do not find in the text of CRSP, therefore, any legal standard to apply to the Secretary's action.

### D. Legislative History of CRSP

Arizona Power strenuously argues that a congressional intent to prohibit geographic preferences is clearly stated in the legislative history of CRSP. It relies most heavily on a statement of the House Committee on Interior and Insular Affairs analyzing Section 7 of CRSP: "All Colorado River Basin States are on the same basis with respect to acquiring electric power and energy from the project." H.R.Rep. No. 1087, 84th Cong., 1st Sess. 16 (1955), *reprinted in* 1956 U.S.C.Cong. & Admin.News, pp. 2346, 2362.[35] Arizona Power contends that the

32. The Court stated further:
> When Congress in an Act grants authority to contract [for the sale of Colorado River water], that authority is no less than the general authority, unless Congress has placed some limit on it.

*Arizona v. California, supra,* 373 U.S. at 580, 83 S.Ct. at 1488.

33. Section 4 states in part:
> Contracts for the sale and delivery of . . . electric energy . . . shall be made in accordance with preferences expressed in the Federal reclamation laws: Provided, That a first preference, to the extent of 25 per centum of such . . . energy, shall be given, under reclamation law, to preference custom-

ers in Trinity County, California, for use in that county. . . .

69 Stat. 720.

34. Congress also had precedents in areas other than hydroelectric power. Statutes enacted at earlier dates included specific allocations of Colorado River water among the basin states. *See, e. g.,* Boulder Canyon Project Act, ch. 42, 45 Stat. 1058 (1928), 43 U.S.C. §§ 617 *et seq.*

35. CRSP was an enactment of S.500, 84th Cong., 1st Sess. (1955). The Senate bill, however, was passed in lieu of H.R. 3383, 84th Cong., 1st Sess. (1955), after substituting for its language the text of the House bill. *See* H.R. Conf.Rep. No. 1950, 84th Cong., 2d Sess. 3

Secretary is thus required to treat each basin state on the "same basis" and that this is the standard we are to apply in reviewing the Secretary's action in this case. When the quoted statement is read out of context, Arizona Power's contention has some force. But after examining the legislative history as a whole, we conclude that Arizona Power has failed to carry its burden of demonstrating that the Marketing Criteria are "clearly contradictory to legislative intent." *Strickland v. Morton, supra,* 519 F.2d at 470.

### 1. Political and Economic Context of the Congressional Debates

The debates on CRSP in general and Section 7 in particular focused on two major issues: the feasibility of marketing hydroelectric power and the application of reclamation law preferences. The first issue was highlighted by an economic struggle between the upper basin states on the one hand, and, on the other, southern California interests and representatives of various non-western states. The non-western states were concerned about the utility and fairness of appropriating $750 million in federal funds for another project designed only for the benefit of the states of the Colorado River Basin. It was argued that the cost per unit of irrigable land to be reclaimed was particularly high. CRSP advocates responded that power revenues would return most of the federal investment, and, therefore, the feasibility of marketing hydroelectric power became a crucial issue.

The southern California interests joined in attacking the feasibility of marketing hydroelectric power in the region. *See* 102 Cong.Rec. 3736 (1956) (remarks of Rep. Udall). Southern California had been the prime beneficiary of the upper basin states' failure to consume the water allocated to them under the Colorado River Compact and Boulder Canyon Project Act. *See id.* at 3506–07 (reprint of Holmes Article). This

unconsumed water was flowing into projects on the lower Colorado River and being used to generate cheap secondary or "dump" power. This power was being sold to southern California utilities at rates much lower than those for firm power generated at Colorado River projects. If the upper basin states were to have projects consuming their share of Colorado River water, southern California would be deprived in large part of its access to less expensive dump power. H.R.Rep. No. 1087, *supra,* at 2, *reprinted in* 1956 U.S.C.Cong. & Admin.News, at 2347.

The southern California interests attacked the feasibility of marketing CRSP power by contending that it would have to be sold at relatively high rates which would not be competitive with rates for alternative energy sources. They also argued against investing in public projects when the upper basin was endowed with vast deposits of thermal energy resources, such as coal and oil shale, that could be developed by the private sector. Finally, they contended that potentially low-cost nuclear power developments in the uranium-rich upper basin would provide serious long-term competition. *See, e. g.,* H.R.Rep. No. 1087 (minority reports), *supra,* at 37–41, 53, 58–59, *reprinted in* 1956 U.S.C.Cong. & Admin.News, at 2383–87, 2399, 2404–05.

The issue pertaining to reclamation law preferences arose from the assumption that preference customers would be able to purchase only a small percentage of CRSP power. CRSP was thus attacked as a federal subsidy for the private utilities which would purchase the bulk of the power. This fear of a private windfall was exacerbated by language in the early CRSP bills that appeared to give nonpreference private customers in the upper basin priority over preference customers outside the upper basin. The result of this controversy was a strong declaration of support for the public utility preference under the reclamation laws.

(1956), *reprinted in* 1956 U.S.C.Cong. & Admin. News, pp. 2422, 2425. Thus, the report of the House committee is, in a sense, the most defini-

tive statement of legislative intent among the various committee reports on CRSP.

We find nothing in the legislative history—when viewed in the context of the two major issues or policies of maximization of power revenues and adherence to reclamation law preferences—indicating that Congress intended to prohibit a geographic preference in the marketing of CRSP hydroelectric power.

### 2. The 83rd Congress

The legislative history of CRSP encompasses hearings and debates in the 83rd and 84th Congresses. We review the history chronologically.

### a. The House of Representatives

On April 2, 1953, three bills to authorize storage projects on the Colorado River were introduced in the House by representatives from the upper basin states of Utah and Colorado.[36] These bills each provided a type of geographic preference for marketing power. Arizona Power places great emphasis on the fact that these mandatory geographic preferences were deleted by the House Committee on Interior and Insular Affairs. Because this is the most crucial

aspect of Arizona Power's argument, we examine this episode in detail.

The bills were similarly worded in their directions for marketing hydroelectric power. Each *required* the Secretary to include in contracts with customers outside the upper basin states a provision for termination or modification to the extent "deemed necessary by the Secretary" to meet power demands in the upper basin states.[37] The implication of these provisions for the financial success of the projects were hotly debated. Bureau of Reclamation Regional Director Larson testified that preference customers in the upper basin states would initially use only ten per cent of the electric power. He estimated that it would take 20 years after the construction of the two largest proposed dams before the upper basin would develop a demand for all CRSP power. Representative Hosmer of Southern California feared that the difficulty in finding purchasers willing to invest in expensive transmission lines for withdrawable power threatened the economic feasibility of the project. *Hearings on H.R. 4449 et al. Before the Subcom. on Irrigation and Reclamation of the House Comm. on Interior and Insular Affairs*, 83d Cong., 2d Sess. 167–70 (1954).[38]

---

**36.** H.R. 4443, 83d Cong., 1st Sess. (1953) (Rep. Aspinall of Colorado); H.R. 4449 (Rep. Dawson of Utah); H.R. 4463 (Rep. Stringfellow of Utah).

**37.** For example, § 4 of H.R. 4463 stated in part: The Secretary is hereby authorized to enter into such contracts or agreements as, in his opinion, are feasible based upon a recognition and evaluation of the benefits arising from integrated operation of other hydroelectric power plants and of the works herein authorized. Electric power generated at plants authorized by this Act and disposed of for use outside the States of the Upper Colorado River Basin shall be replaced from other sources, as determined by the Secretary, when required to satisfy needs in the States of the Upper Colorado River Basin, at rates not to exceed those in effect for power generated at plants authorized by this Act. Contracts for the sale of power for use outside the States of the Upper Colorado River Basin shall contain such provisions as the Secretary shall determine to be necessary to effectuate the purposes of this Act, including the provision that if and when the Secretary finds (a) that such power cannot practicably be replaced from ot' · sources at rates not

exceeding those in effect for power generated by plants authorized by this Act, and (b) that such power is required to satisfy needs in the States of the Upper Colorado River Basin, then such contracts shall be subject to termination or to modification to the extent deemed necessary by the Secretary to meet power requirements in the States of the Upper Colorado River Basin.

**38.** Part of the Larson-Hosmer dialogue reads:
Mr. Larson. . . . If we should build all 9 dams now, there is not sufficient present market for the output of all 9 dams in the upper basin. But there is sufficient market for the Glen Canyon and Echo Park. That does not mean that some will not go downstream.
Mr. Hosmer. That brings up a point here in this specific piece of legislation that is before the House that requires the Secretary of the Interior to insert a termination clause in any contract for power going outside of the Upper Colorado Basin. It can be terminated when and if the power is needed up there. With that in mind, do you think that anybody outside of the upper basin would buy the power subject to having it cut off?

Moffat, a representative of ten upper basin private utilities, proposed one solution. He expressed a desire that CRSP power be marketed to private utilities in the upper basin states rather than preference customers outside of the area. He also proposed that long-term contracts be entered into so that the private utilities could afford to invest in transmission facilities. *Id.* at 570–71.

Preference customers vigorously attacked these proposals. The National Rural Electric Cooperative Association prepared a statement charging that the mandatory geographic preference might lead

> to modification and perhaps abrogation of the preference provision of the reclamation laws . . . . In other words, were the rural electic [sic] systems and other preference agencies in the *upper* Colorado River Basin States unable to *initially or ultimately utilize all of the firm energy* available from the projects, the remaining portion of the energy would be sold to nonpreference customers within these States, if they desired it, rather than to preference customers lying [even slightly] outside of the upper Colorado River Basin area, even though the power could be made available to the preference customers over the existing or proposed facilities of the Federal Government that were electrically integrated

with the upper Colorado River Basin project. In general, neither State lines nor the peripheries of river basins bear any relation in distance from a project to economical transmission distances from a project.

*Id.* at 897 (emphasis added). The rural electric cooperatives also criticized the private utilities for advocating that any marketing plan be incorporated in the text of legislation. They argued that the Secretary's broad discretion in contracting with power customers should be bounded only by the traditional limitations imposed by the reclamation law preferences of Section 485h(c) and the requirement of economic stability. The cooperatives feared that participation by private utilities might deprive them of the full benefits of the project. *Id.* at 898.[39]

In light of these points of contention the House Committee on Interior and Insular Affairs made two successive amendments. The Committee first substituted for the three proposed bills the language of a draft bill from the Interior Department. H.R. Rep. No. 1774, *supra*, at 19. In place of the mandatory withdrawal clauses of the original bills, Section 6 of the new version placed a ten-year limit on contracts to customers outside of the upper basin states unless the Secretary determined that the power sold was in excess of the probable needs in the upper basin states.[40] The

---

Mr. Larson. I could not speak for those power purchasers.

Mr. Hosmer. Is it not a fact that the purchasers of power consider the continuation of the supply over a definite period of time an essential?

 \* \* \* \* \* \*

Mr. Hosmer. It is not a fact that it would be risky for any power consumer to attempt to rely upon such a source of power under those conditions?

Mr. Larson. They could not build expensive transmission lines for them.

Mr. Hosmer. You have to have transmission lines to move it.

*Hearings on H.R. 4449, supra,* at 169–70.

**39.** The Attorney General subsequently construed the preference provision in § 5 of the Flood Control Act of 1944, ch. 665, 58 Stat. 890, 16 U.S.C. § 825s, as not contemplating the "disposition [of power] to a private company under an arrangement whereby the latter obli-

gates itself to sell an equivalent amount of power to preference customers to be designated by the Secretary." 41 Op.Atty.Gen. 236, 244 (1955).

**40.** Section 6 of the Interior Department's bill stated in part:

> No contract or agreement for the sale of electric power generated at plants authorized by this Act shall be made for a period of more than 10 years when such power is disposed of for use outside the States of the Upper Colorado River Basin, unless the Secretary of the Interior shall have determined that such power is surplus to the probable needs in such States. All other contracts for the sale of electric power pursuant to this Act shall be for periods not to exceed forty years.

H.R.Rep. No. 1774, *supra,* at 29.

Committee then amended Section 6 by deleting the time limitation on contracts with lower basin customers. It explained the purpose of its amendment as follows:

> By this amendment *all States* of the Colorado River Basin *would be placed on the same basis with respect to acquiring electric power from the project.* In discussing section 6, the committee considered writing into this legislation a power preference provision similar to those in existing reclamation law. Such a provision was not specifically written in because the provisions in general reclamation law, including the Reclamation Project Act of 1939 [Section 485h(c)] and the Flood Control Act of 1944, would be applicable to this project under section 3. The committee wishes to make it clearly understood that, although a power preference provision is not specifically written into this legislation, the committee fully supports the application of existing power preference provisions to this project.

*Id.* at 22 (emphasis added).

This is the first point in the legislative history where the phrase "same basis" is used by a committee. Arizona Power interprets this statement as prohibiting geographic preferences. But reading the statement in the context of the hearings on the mandatory geographic preferences in the

original bills, we cannot agree. No one at the hearings objected to the original preferences on the ground that the lower division states would be deprived of their fair share of CRSP power.[41] Instead the critics of the provisions were concerned solely with generating maximum power revenues while adhering to the reclamation law preference for public utilities. The Committee report expressed similar concerns.[42] We believe that when the Committee stated that all states would be "on the same basis," it meant that the Secretary should have discretion to market CRSP power wherever he thinks best to maximize revenues consistent with reclamation law preferences. The Committee deleted mandatory preferences because it feared that they might unduly fetter the Secretary's discretion and hamper his efforts to achieve CRSP's underlying objectives. But the Committee did not prohibit the Secretary from adopting a geographic preference if at some time in the future he determined that such a preference was consistent with the policies of maximizing revenue and adhering to reclamation law preferences.

Significantly, Arizona Power does not argue that the Marketing Criteria will lead to a loss of potentially recognizable power revenues or a decrease in the firm power rates. Nor does it argue that the Marketing Criteria are inconsistent with reclamation law

41. Arizona Power can point to only one instance where any argument has ever been made specifically on behalf of Arizona's interest in CRSP power. A 1950 Bureau of Reclamation report on CRSP analyzed the marketing area solely in terms of the states of Colorado, Utah, Wyoming and New Mexico. *See* H.R. Doc. No. 364, 83d Cong., 2d Sess. 156 *et seq.* (1954). Governor Pyle of Arizona objected to the exclusion of his state from the proposed marketing area, particularly since Glen Canyon was within Arizona territory. The Governor gave no indication, however, of what percentage of CRSP power he thought Arizona should have. Thus, his statement provides no help in establishing a standard to review for reasonableness the 20 percent allocated to the southern division in the Marketing Criteria. *See also* H.R.Doc. No. 364, *supra* at 8–9 (letter from Governor Pyle).

42. *See* H.R.Rep. No. 1774, *supra*, at 23–24 (emphasis added):

> [T]he committee expects the proposal by the private power companies for cooperation in the development to be carefully considered by the Department of the Interior and the electric power and energy of the project to be marketed, so far as possible, through the facilities of the electric utilities operating in the area, *provided, of course, that the power preference laws are complied with and project repayment and consumer power rates are not adversely affected.*

The Secretary argues that the insertion of Section 6 was designed merely to remedy the previous inapplicability of Section 485h(c) preferences. This is erroneous. Section 2 of each of the three bills submitted provided that all of the statutory law of reclamation was applicable to CRSP, except as otherwise provided. The bills did not, therefore, except application of Section 485h(c) from CRSP. The Committee explanation of Section 6 should be viewed as a statement of clarification only.

preferences. Arizona Power argues only that it was "the congressional understanding" that maximum revenues could be achieved under the reclamation law preferences only if CRSP power were sold to Arizona preference customers on a *permanent* basis.

This argument would have some substance if Arizona Power could point to clear evidence that the Committee desired a certain portion of CRSP power allocated to the lower division states and to Arizona in particular. It does not, nor could it. The Committee states that a major purpose of the bill was to provide hydroelectric power for the expanding economy "of the area," referring to the upper basin. H.R.Rep. No. 1774, *supra*, at 11.[43] The Committee did note that there was an increasing need for electric energy "[w]ithin and adjacent to the Upper Basin." *Id.* at 13. But it does not appear that any significant portion of Arizona was encompassed under this latter description.[44]

We therefore conclude that it was not the House Committee's understanding that CRSP success depended on any given geographic allocation of power. The understanding was that success required only that the Secretary have discretion to market CRSP power in the best interests of the government.

### b. The Senate

Proceedings in the Senate closely paralleled those in the House. A bill was introduced there similar to those introduced in the House, S.1555, 83d Cong., 1st Sess. (1953), and hearings were held on the measure. *Hearings on S.1555 Before the Subcomm. on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs*, 83d Cong., 2d Sess. (1954). Many of the same witnesses presented similar testimony. *See, e. g., id.* at 575 (statement of private utilities), 687 (National Rural Electric Cooperative Association). Southern California interests again opposed the proposed legislation. *See* S.Rep. No. 1983, 83d Cong., 2d Sess. 25–30 (1954) (minority views of Sen. Kuchel). The House Committee's amended bill and report were before the full Senate Committee. *See id.* at 20–24.

Section 4 of the Senate bill contained a mandatory geographic preference in favor of the upper basin states identical to that contained in the House bills. There was little discussion of the marketing problem. The Committee deleted the mandatory preference but did not detail its reasons in its report. Arizona Power points to broad language in the report that "there is a ready market [for hydroelectric power] throughout all the Colorado River Basin States." S.Rep. No. 1983, at 2–3. This statement, however, is ambiguous at best. The preceding paragraph specifically noted that the upper basin states anticipated rapid growth with a resulting "urgent need for water and power," particularly in the Albuquerque, Denver and Salt Lake City metropolitan areas. *Id.* at 2.[45] The legislative

---

**43.** The President's statement of approval of the legislation transmitted to the Committee also referred to the upper basin's "much-needed electric power." H.R.Rep. No. 1774, *supra*, at 25.

**44.** The National Rural Electric Cooperative Association referred to a group of 18 member systems that were "within or directly adjacent" to the primary marketing area described by Bureau officials before the Subcommittee. The systems were located in Idaho and in the northern division states of Colorado, Utah, Wyoming and New Mexico. *Hearings on H.R.4449, et al., supra*, at 895. The Association was informed by Bureau Regional Director Larson that some power would be marketed in northeastern Arizona. *See id.*

We note that the large power load centers of Denver, Salt Lake City and Albuquerque are within upper basin states, but are outside the upper basin proper. They would therefore be "adjacent" to the upper basin.

The group of ten private utilities which was represented before the Subcommittee included Arizona Public Service Company. *Id.* at 556. We cannot tell from the record, however, whether Arizona Public Service Company was primarily interested in marketing power to central and southern Arizona.

**45.** Testimony of Senators presenting statements on the bill also reflected an intent to market power in the four upper division states of the upper basin. *See, e. g., Hearings on S.1555, supra*, at 20 (statement of Sen. Barrett,

history, therefore, presents no clear evidence that the Senate Committee in the 83rd Congress intended to prohibit all types of geographic preferences.

### 3. The 84th Congress

The House and Senate bills did not reach a vote in their respective chambers during the 83rd Congress and were left as unfinished business with the adjournment of Congress. Successor bills were introduced in the 84th Congress and one, S. 500, was eventually enacted as CRSP.

### a. The Senate

Senator Anderson of New Mexico, chairman of the Senate Subcommittee on Irrigation and Reclamation, introduced S.500 and presided over the hearings on the bill. He described S.500 as identical to S.1555 reported out of the Committee to the last Congress. *Hearings on S.500 Before the Subcomm. on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs*, 84th Cong., 1st Sess. 1 (1955). Therefore he requested the witnesses to view the hearings as supplemental to the previous hearings and to emphasize new material only. *Id.*

Testimony presented at these hearings further supports our view that not all geographic preferences are contrary to the legislative intent. Several witnesses emphasize the benefits of the project to the upper basin states.[46] Senator Hayden of Arizona denied that Arizona had any special claim to CRSP power from the Glen Canyon Dam to be built in Arizona.[47]

Arizona Power contends that the Senate Committee's report on the hearings on S.500 reemphasized its prior position opposing preferential treatment of the upper basin. S.Rep. No. 128, 84th Cong., 1st Sess. (1955). It quotes the following paragraph from the report:

The committee's position on power marketing of the project is that the area to be served shall be governed only by economical transmission distance direct or through interconnections with other plants either in the Upper or Lower Basin. This policy is necessary to the economic and financial health of the project. This policy in the committee's opinion accords with established practice and policies of reclamation power operations. The committee intends that full equality of treatment be accorded to both Upper and Lower Basin power customers. Established preferences and sound business principles in accordance with existing reclamation law are intended to be applied in the marketing of power from the project, and it is not intended that Lower Basin customers should be discriminated against in any respect.

*Id.* at 14. We believe that Arizona Power's argument misses the mark.

We note first that the Committee described the power marketing area in much the same terms as it had in the 83rd Congress. *See* Section II, *D, 2 b supra.* It stated generally and by way of summation that "there is a ready market throughout all the Colorado River Basin States." S.Rep. No. 128, *supra*, at 3. But it also described S.500 as designed to provide hydroelectric power to meet the projected rapidly increasing demand for power in the upper basin.[48]

---

member of the Committee); *id.* at 178 (statement of Sen. Chavez).

**46.** *Hearings on S.500, supra*, at 18–19 (testimony of Bureau of Reclamation Commissioner Dexheimer); *id.* at 47 (testimony of Regional Director Larson); *id.* at 524–25 (statement of Sen. Watkins); *id.* at 330 (testimony of National Rural Electric Cooperative Association representative).

**47.** *Id.* at 719–20. Senator Goldwater of Arizona also made a statement on the project, but

did not refer to power marketing problems of CRSP. *Id.* at 565–70.

**48.** The report stated:

On its [Upper Basin] fringes lie such large centers of population as Albuquerque, Denver, and Salt Lake City and their environs, each of which has experienced rapid growth in recent years; each of which anticipates additional significant growth with ever more urgent need for water and power . . . . The Upper Basin proper . . . stands . . . on the verge of great industrial

Second, we note that the hearings on S.500 shed no additional light on the power marketing problem.

We therefore conclude that the anti-discriminatory language in the Senate Committee's report merely reflects two policy decisions: first, that the reclamation law preferences be adhered to and second, that power not be marketed in favor of upper basin customers in such a way as to return less than the maximum recognizable power revenues. Arizona Power candidly admits that these two policies are articulated. When the anti-discrimination language of the last clause is construed in light of all that preceded it in the paragraph, it conforms precisely to our view.

Arizona Power does not argue that northern division customers served pursuant to the Marketing Criteria are outside economical transmission distances. Nor does it contend that implementation of the Marketing Criteria will impair the financial health of CRSP. Furthermore, Arizona Power fails to convince us that the "established practice and policy" of federal power marketing forbids all types of geographic preferences. We reject Arizona Power's theory that the Marketing Criteria clearly violate the legislative intent of the Senate Committee in the 84th Congress.

### b. The House of Representatives

After the Senate Committee on Interior and Insular Affairs had issued its report and during the time that S.500 was debated on the floor of the Senate, the House Sub-committee on Irrigation and Reclamation held hearings on five CRSP bills introduced by upper division congressmen.[49] *Hearings on H.R. 270 et al. Before the Subcomm. on Irrigation and Reclamation of the House Comm. on Interior and Insular Affairs*, 84th Cong., 1st Sess., pts. 1 & 2 (1955). Subcommittee Chairman Aspinall of Colorado indicated, as Senate Subcommittee Chairman Anderson had done earlier, that the hearings in the 84th Congress were to be a continuation of the hearings on CRSP bills in the 83rd Congress. *Id.*, pt. 1, at 1.

Despite Arizona Power's argument that the House Committee in the 83rd Congress had rejected all geographic preferences, witnesses before the Subcommittee repeatedly assumed that the upper basin (upper division) states would be the principal beneficiaries of CRSP power.[50] Arizona Power concedes as much. Yet the report of the House Committee omitted any clarification of what Arizona Power would consider an erroneous assumption. H.R.Rep. No. 1087, *supra*, at 1, *reprinted in* 1956 U.S.C. Cong. & Admin.News, p. 2346. Indeed, the Committee recognized the merit of the testimony submitted by representatives of the upper basin states advocating the enactment of CRSP to meet growing energy demands in their region. H.R.Rep. No. 1087, *supra*, at 4–5, *reprinted in* 1956 U.S.C. Cong. & Admin.News, pp. 2350–51. This serves as persuasive evidence that the Committee intended that the upper basin states be the primary beneficiaries of the legislation.[51] Therefore, the "same basis" stan-

---

growth, with consequent increase in need for water for . . . power. *Id.* at 2–3.

**49.** H.R. 270, 84th Cong., 1st Sess. (1955) (Rep. Dawson of Utah); H.R. 2836 (Rep. Fernandez of New Mexico); H.R. 3383 & 3384 (Rep. Aspinall of Colorado); H.R. 4488 (Rep. Rogers of Colorado).

**50.** *Hearings on H.R. 270 et al., supra*, pt. 1, at 48, 52 (testimony of Bureau of Reclamation Commissioner Dexheimer); *id.* at 54 (testimony of Regional Director Larson); *id.* at 720–21 (statement of Senator Watkins); *see id.* at 482–83 (statement of Senator Bennett).

**51.** Minority reports filed by members of the Committee from southern California and East-ern states provide further evidence. A leading argument against CRSP was that it would burden the states of Wyoming, Colorado, Utah and New Mexico with high-cost hydroelectric power. It was urged by the dissenters that the coal, oil shale and uranium deposits in the four-state region be exploited instead as more economical in the long run. H.R.Rep. No. 1087, *supra*, at 38–39, *reprinted in* 1956 U.S.C. Cong. & Admin.News, pp. 2384–85 (minority views of Reps. Saylor, Pillion, Hosmer, Utt, Haley & Shuford); *id.* at 2399 (minority report of Reps. Haley & Shuford); *id.* at 2405 (adverse report of Rep. Pillion); *id.* at 2414 (supplemental minority views). See *Hearings on H.R. 270*

dard of treatment for Colorado River Basin states advocated by the Committee cannot reasonably be interpreted to prohibit all types of geographic preferences.

Arizona Power's response to this evidence is to quote a discussion between Representative Rhodes of Arizona and Commissioner Dexheimer.[52] Arizona Power argues that the conversation reflects an understanding that the deletion of the mandatory preferences from the bills in the 83rd Congress was intended to bar all geographic preferences. This argument is not persuasive. The discussion in fact can more easily be interpreted as granting the Secretary broad discretion in marketing power as long as he complies with the reclamation law preferences and obtains optimum power revenues.

We therefore conclude that the House Committee's requirement that all basin states be "on the same basis with respect to acquiring electric power," when viewed in light of the preceding legislative history, does not prohibit all geographic preferences in power marketing.

### 4. Floor Debates

The floor debates in both legislative bodies support this conclusion. It was unquestionably the understanding in both chambers that the upper basin was eventually to receive the lion's share of CRSP power. While CRSP § 16, 43 U.S.C. § 620o defines the term "States of the Upper Basin" as including Arizona, it is quite clear that Congress, like the committees, did not have Arizona in mind when it referred to the upper basin in the context of power marketing.[53]

#### a. The Senate

Several groups opposed CRSP in lengthy debates on the Senate floor in 1955. Senator Douglas led the eastern interests opposed to appropriating money for projects of no direct benefit to them. Senator Kuchel represented the California interests who did not want their cheap source of secondary power diminished. Both groups phrased their arguments in terms of the adequacy of power revenues to reimburse most of the CRSP outlay. They also took

et al., supra, pt. 2, at 486 (statement of Rep. Hosmer advocating atomic energy plants in upper basin).

**52.** The discussion was as follows:

Mr. Rhodes. . . . You will recall in the hearings in the 83rd Congress there were provisions for power preference to the States of the upper basin.

I note in the report from the Department and in the bills now, there is no such power preference for any State.

Is it the thought of the Department that the power from Glen Canyon would be marketed on a free and open market, or is there some other thought behind the Department's plans?

Mr. Dexheimer. Of course, we are bound to the present preference laws and the 1937 act. But at the present time we do not know, and we probably won't until we are ready to enter into negotiations for those contracts, who the customers will be nor how much power they will take nor how long a period of time the contract should be made for.

Mr. Rhodes. Is it the thought of the Department, then, that the marketing of power from Glen Canyon will be to those customers, first, which have a preference under the reclamation law, and, second, to those customers to whom sales can be made that are determined

to be most advantageous to the Federal Government and the economy of the West?

Mr. Dexheimer. Normally that would be the case unless there should be some provision in the authorization that would be controlling.

Mr. Rhodes. But for the present time there is no such provision, as I read it.

Mr. Dexheimer. Nothing in these bills that I know of.

Mr. Dawson [of Utah]. If I recall in the bills that were introduced last year, there were provisions written into the bills themselves which would limit the marketing of power to the upper basin. And those restrictions are not in the bill this year.

Mr. Rhodes. That is correct.

Hearings on H.R. 270, et al., supra, pt. 1, at 298.

**53.** See note 7 supra. Arizona Power does not dispute this. Nor would it help Arizona Power to argue that Arizona was considered part of the upper basin for power marketing purposes. To do so would mean that Arizona would then lose the broad protections against discriminatory treatment of lower basin customers that Arizona Power claims is in the legislative history.

advantage of the successful nationwide opposition to the large Echo Park project based on scenic and conservationist grounds.

One of Senator Douglas' arguments was that the CRSP irrigation benefits in the upper basin were high-cost and would be reimbursed only to a limited extent. 101 Cong.Rec. 4576 (1955). Subcommittee member Senator Watkins of Utah, floor manager and cosponsor of S.500, pointed out that the landowners of the upper basin would also be in the same community as the power users. The power users would reimburse a large portion of the project through payment for power. Thus members of the same community would cooperate in paying for CRSP. *Id.* Senator Douglas' later comments indicated that both he and Senator Watkins were referring to power users in the four upper division states. *Id.* at 4578. Subsequent exchanges further clarified this understanding.[54]

We recognize that the remarks of opponents of a bill may not always be authoritative. *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). But Senator Douglas' inferences are certainly relevant and helpful, particularly when Senator Watkins made no response to Senator Douglas' description of the states to be benefited by CRSP. *Arizona v. California, supra,* 373 U.S. at 583 n. 85, 83 S.Ct. 1468. More importantly, the statements of Senator Watkins, as cosponsor and floor manager, are entitled to substantial weight in construing the power marketing provisions

of CRSP. *National Woodwork Manufacturers Ass'n v. NLRB,* 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Senator Watkins' representation of Utah, which stood to benefit from his interpretation of the primary power marketing area, does not diminish the probative value of that interpretation. *Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564 n. 17, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976).[55]

### b. The House of Representatives

Arizona Power's position does not fare any better when measured against the House debates of 1956. They demonstrate without question that the intent of the House in passing H.R. 3383 was to favor the upper basin states.

Representative Miller, a member of the Subcommittee, gave an introductory speech on the need for water and power in the growing upper basin. 102 Cong.Rec. 3471 (1956). He referred to the Colorado River Compact which allocated 7,500,000 acre-feet of water a year to both lower and upper basins and stated that CRSP would enable the upper basin to utilize effectively its share of water *and the electric energy* that could be generated from its water.[56] *Id.; see id.* at 3299 (remarks of Committee Chairman Engle). Subcommittee Chairman Aspinall, author of H.R. 3383, specifically stated that the area intended to receive CRSP benefits was composed of Colorado, Utah, Wyoming and New Mexico. *Id.* at 3510; *see id.* at 3610 (remarks of Subcommittee Member Dawson).[57]

---

**54.** 101 Cong.Rec. 4578–79, 4635; *see* note 55 infra.

**55.** Senator Watkins repeatedly assumed that CRSP power would be marketed in the upper division states. 101 Cong.Rec. 4666–68, 4800–01 (1955). More importantly for our purposes, however, he clearly stated that the Bureau of Reclamation would be vested with the discretion to determine where the power would be sold, the duration of the contracts to be negotiated and the rates to be charged. *Id.* at 4666–67. This reference to agency discretion is in harmony with an earlier comment by Representative Rhodes that "the Bureau will have more or less a free hand in marketing power." *Hearings on H.R. 4449, et al., supra,* at 163.

**56.** *See* Colorado River Compact Art. IV(b), *reprinted in* 70 Cong.Rec. 325 (1928) (". . . water of the Colorado River system may be impounded and used for the generation of electrical power . . . ."). *See also* 102 Cong. Rec. 3478 (1956).

**57.** Representative Dawson did refer to Arizona on one occasion. But it is obvious from the context of his remarks that Arizona would be a secondary marketing area. 102 Cong.Rec. 3610 (1956).

*See also* 102 Cong.Rec. 3713 (remarks of Reps. Dawson and Rogers); *id.* at 3750 (remarks of Rep. Miller); *id.* at 3753 (remarks of Rep. Vanik); *id.* at 3624 (remarks of Rep. Dempsey).

Opponents of the bill did not dispute this basic proposition, repeatedly reaffirmed throughout the course of the debates. As in the Senate, they attacked the power aspect of CRSP as not competitive with alternative energy sources in the upper basin area. During the lengthy debates not one member argued in favor of a position similar to that advocated by Arizona Power. We think what Arizona's representatives did advocate is significant. Immediately after ridiculing an argument against the power aspects of CRSP, Representative Stewart Udall remarked:

I want to tell you why my Republican colleague from Arizona [Mr. Rhodes] and I have supported this bill. We regard the Colorado River Basin as a community. This community sat down many years ago to work out a development plan. Unfortunately, southern California got ahead of us when work began. Why, then, are we here supporting this measure? *Not because our State benefits from it* but because we are keeping the agreement that our State made at that time.

*Id.* at 3736 (emphasis added).

In some cases a "committee's unambiguous and unaltered treatment" of an issue "is more probative of congressional intent than the casual remark of a single Senator [or Representative] in the floor debate." *Chandler v. Roudebush,* 425 U.S. 840, 858 n. 36, 96 S.Ct. 1949, 1959, 48 L.Ed.2d 416 (1976). Our review of the extensive floor debates on CRSP convinces us, however, that in the present case those debates are highly probative of congressional intent.[58] Further, the message of those debates is

clear: both legislative bodies intended the upper (northern) division states to be eventually the primary beneficiaries of the legislation. Our review of the floor debates leads us to believe that Congress intended some type of geographic preferences in favor of the states of the upper division.

### 5. Summary of Legislative History

Arizona Power has failed to carry its burden of demonstrating that the Marketing Criteria clearly violate the legislative intent behind CRSP. The deletion of the mandatory geographic preferences in the bills introduced in the 83rd Congress does not indicate an intent to invalidate all geographic preferences. In our view, that deletion had two purposes: (1) to ensure compliance with Section 485h(c) reclamation law preferences by not permitting nonpreference customers in the upper division states a priority over preference customers outside that area; and (2) to ensure that power be marketed at firm power rates that would maximize power revenues needed to reimburse the government.

The geographic preference of the Marketing Criteria does not contravene these policies. First, the existence of some sort of withdrawal program was certainly contemplated by Congress. The history consistently evidenced an intent to promote primarily the development of the upper division states. This intent is effectively accomplished by a scheme to market eventually the bulk of CRSP power to the upper division states while generating power revenues in the interim by selling significant blocks of power to lower division customers. Withdrawal is the only means of reconciling these two goals.[59] Second, the Marketing

---

58. The conference committee adopted the language of the House-approved bill (H.R. 3383) where it differed from the Senate version of S.500. Conf.Rep.No. 1950, *supra,* at 3, *reprinted in* 1956 U.S.C.Cong. & Admin.News pp. 2422, 2425. In amending Section 7 of H.R. 3383 on power marketing no pertinent changes were made in response to the floor debates on a preference for the upper division states. *Id.* at 2–3, *reprinted in* 1956 U.S.C.Cong. & Admin. News, pp. 2423–24.

59. It cannot be argued persuasively that the CRSP projects were scheduled to be constructed so as to avoid withdrawal. The Glen Canyon power plant, the project closest to the lower basin customers, was scheduled to be the first in operation in 1963. Because the Glen Canyon project is to contribute 900,000 kilowatts of the approximately 1,260,000 kilowatts projected by CRSP, the bulk of the CRSP power to be marketed eventually to the upper basin must come from Glen Canyon. This necessitates withdrawal of allotments of power from

Criteria do not permit nonpreference customers to have a priority over preference customers.

We conclude, therefore, that Arizona Power has failed to establish from the legislative history that the Secretary's action falls outside the realm of his discretion and conflicts with congressional purposes. Equally significant, in our view, is Arizona Power's failure to identify in the legislative history a standard for administrative conduct against which we can measure the Secretary's action. It must be remembered that our task, or at least a part of our task, in this review is to determine whether "there is [a] law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 410, 91 S.Ct. 814. Arizona Power has alleged, unsuccessfully, that the geographic preferences violate congressional intent, but it has failed to articulate what law we should apply; *i. e.,* it did not demonstrate what the congressionally devised standard for power distribution is.

Perhaps Arizona Power is suggesting that the applicable law is a "same basis" standard. But we find this standard so vague as to be meaningless and hence no genuine limitation on the Secretary's discretion. For example, a "same basis" standard could be construed as requiring each of the seven basin states to receive one-seventh of the power. It should be noted that Arizona now receives more than a one-seventh share. Alternatively, the "same basis" standard could require allocation on the basis of each state's population, number of preference customers, past or projected energy needs, or the amount of Colorado River water allocated to each state under the

Colorado River or Upper Colorado River Basin Compacts.[60] But the legislative history provides no basis for adopting any of these interpretations as the controlling standard for CRSP power distribution. Rather, that history points to a congressional commitment of the decision—within certain express limitations not applicable here—to the discretion of the Secretary.

### E. Administrative Interpretation

The Secretary also counters Arizona Power's argument by alleging a long-standing administrative interpretation of his statutory authority which is contrary to Arizona Power's theory. The Secretary argues that the formulation of the Marketing Criteria in 1960 and their subsequent insertion into contracts for the sale of CRSP power is a long-standing and reasonable construction entitled to deference. *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). In this context, we note that Secretary Seaton approved and announced the Marketing Criteria in 1960. After the change in administrations, the Marketing Criteria were reissued in similar form with respect to the issue presented here. Secretary Stewart Udall approved and announced the reissued Marketing Criteria in 1962. Secretary Udall had been an Arizona representative on the House Subcommittee which held hearings on CRSP, a member of the Committee which issued the majority report and an advocate on the floor of the House for CRSP. We think it would be difficult to conceive of a situation where "the interpretation given the statute by the officers or agency charged with its administration" is entitled to more deference.

lower basin customers purchasing Glen Canyon power in the early years of the project.

**60.** Section 5(e) of CRSP, *as amended,* 43 U.S.C. § 620d(e) provides another possible basis for power allocation. CRSP revenues, composed predominantly of power revenues, in excess of certain repayment and operating costs would be paid out of the Upper Colorado River Basin Fund to upper basin states for further development. The apportionment is as follows: Colorado, 46 per cent; Utah, 21.5 per cent; Wyo-

ming, 15.5 per cent; and New Mexico, 17 per cent. Arizona is not mentioned at all. Arizona, on the other hand, does benefit from the Lower Colorado River Basin Development Fund which contains surplus revenues from lower basin projects such as Hoover Dam, the Parker-Davis project and the Central Arizona project. Colorado River Basin Project Act, Pub.L. 90–537, § 403, 82 Stat. 894 (1968), *as amended,* 43 U.S.C. § 1543.

*Udall v. Tallman, supra,* 380 U.S. at 16, 85 S.Ct. [792], at 801.[61]

Arizona Power responds to the administrative interpretation argument by describing the Marketing Criteria as unreasonable and directly contrary to the legislative will. We have already rejected its legislative intent argument.

Arizona Power also contends that the asserted administrative interpretation is not long-standing. Its argument is that the Marketing Criteria were not applied until the 1970 notice of withdrawal of power; prior to that time the administrative interpretation had no detrimental impact because CRSP power for southern division customers was ample. Thus, the duration of the interpretation should be measured only from the time it adversely affected lower division utilities.

We disagree with this argument. Severe detrimental impact of an administrative interpretation is only one factor to be considered in applying *Tallman. Udall v. Tallman, supra,* 380 U.S. at 18, 85 S.Ct. 792. Here the Secretary's interpretation was "notorious" and a "matter of public record" since 1960. *Id.* at 16–18, 85 S.Ct. 792. Its notoriety was heightened by insertion of withdrawal provisions into 87 binding contracts with power customers. The interpretation may properly be treated, therefore, as a "long-standing rule" for purposes of *Tallman.*

We believe that the administrative interpretation of the Secretary's authority is entitled to deference. That interpretation serves as additional evidence that the intent of Congress has not been violated by the

Secretary's proposal to withdraw power pursuant to contracts and entered into under the Marketing Criteria.

## III. Conclusion

Having decided the jurisdictional issues against Arizona Power, we do not need to reach the remaining issues argued by the parties.

We are without jurisdiction to review this case. 5 U.S.C. § 701(a)(2). The order staying the Secretary's implementation of his marketing plan is vacated. The judgment of the district court is vacated and the case remanded for consideration of a motion to dismiss the action.

**VACATED AND REMANDED.**

---

**61.** The Secretary also contends that Congress has ratified the administrative interpretation. He first points to the circulation of the Marketing Criteria to concerned congressmen and then notes that Congress annually approves appropriations to finance the construction, operation and maintenance of CRSP. But he fails to point to sufficient evidence of a congressional intent to ratify by means of appropriating funds. *See Arizona Power Pooling Association v. Morton, supra,* 527 F.2d at 725–26.

The Secretary's second argument is that Section 602 of the Colorado River Basin Project, requiring Section 7 of CRSP, 43 U.S.C. § 620f,

to be administered in accordance with its criteria, constitutes ratification of the Marketing Criteria. Pub.L. 90–537, 82 Stat. 900 (1968), 43 U.S.C. § 1552(c). Arizona Power contends, however, that Section 602 on its face deals only with criteria for coordination of water releases from reservoirs constructed under the CRSP and Boulder Canyon Project Acts. But the legislative history reveals quite clearly that Section 602 was directed to the coordination of the power operations of all the projects. H.R. Rep. No. 1311, *supra, reprinted in* 1968 U.S.C. Cong. & Admin.News, p. 3729.