The BOARD OF the COUNTY COMMISSIONERS OF the COUNTY OF ARAPAHOE, and Union Park Water Authority, Applicants–Appellants/Cross-Appellees,

v.

CRYSTAL CREEK HOMEOWNERS' ASSOCIATION; Milton Graves, Charles Hubbard, and Nancy Williams, Trustees, Objectors –Appellees/Cross–Appellants,

and

Colorado River Water Conservation District; Upper Gunnison River Water Conservancy District; United States of America; Henry J. Berryhill, Jr.; Board of County Commissioners of Gunnison County; Town of Crested Butte; City of Delta; City of Montrose; City of Grand Junction; City of Gunnison; Tri–State Generation and Transmission Association, Inc.; Colorado Wildlife Federation; Crested Butte Water and Sanitation District; East River at Almont Property Owners Association; Gunnison Angling Society; Gunnison County Electric Association; National Wildlife Federation; High Country Citizens' Alliance; Rainbow Services, Inc.; Western Colorado Congress; Mr. and Mrs. Charles Reeder; Virgil and Lee Spann Ranches, Inc.;

State Engineer; Three Rivers Resort, Inc.; Uncompahgre Valley Water Users Association; Joseph P. Vader; Raymond R. Van Tuyl; Charles Richard Collard; Thomas E. Collard and Taylor Park Pool Association, Objectors–Appellees,

and

Kenneth Knox, Division Engineer, Water Division 4, Appellee pursuant to C.A.R. 1(e).

No. 98SA327.

Supreme Court of Colorado, En Banc.

Nov. 20, 2000.

As Modified on Denial of Rehearing Dec. 18, 2000.

326

Vranesh and Raisch, LLP, Paul J. Zilis, John R. Henderson, Boulder, CO, Attorneys for Applicants–Appellants/Cross–Appellees.

Petros & White, LLC, Charles B. White, Denver, CO, Attorneys for Objectors–Appellees/Cross–Appellants.

David C. Hallford, General Counsel, Jill C.H. McConaughy, Associate Counsel, Glenwood Springs, CO, Attorneys for Objector–Appellee, Colorado River Water Conservation District.

Bratton & McClow, LLC, L. Richard Bratton, John H. McClow, Gunnison, CO, Attorneys for Objector–Appellee Upper Gunnison River Water Conservancy District.

Department of Justice, Lois J. Schiffer, Assistant Attorney General, James C. Kilbourne, Attorney, Andrew C. Mergen, Attorney, Hank Meshorer, Special Litigation Counsel, Environment & Natural Resources Division, Washington, DC, Attorneys for Objector–Appellee United States of America.

Gunnison County Attorney, David Baumgarten, Gunnison, CO, Attorney for Objector–Appellee Board of County Commissioners of Gunnison County.

Moses, Wittemyer, Harrison & Woodruff, P.C., Timothy J. Beaton, Boulder, CO, Attorneys for Objector–Appellee City of Gunnison.

Bruce C. Driver, Boulder, CO, Attorney for Objector–Appellee Colorado Wildlife Federation, High Country Citizens' Alliance, and Rainbow Services, Inc.

Woodrow & Roushar, Victor T. Roushar, Montrose, CO, Attorneys for Objector–Appellee Uncompahgre Valley Water Users.

Office of the State Attorney General, Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Felicity Hannay, Deputy Attorney General, Joseph C. Smith, Jr., Deputy Attorney General, Lee E. Miller, First Assistant Attorney General, Steven O. Sims, First Assistant Attorney General, Susan J. Schneider, Assistant Attorney General, Natural Resources Section, Denver, CO, Attorneys for the Division Engineer for Water Division 4.

Holly I. Holder, P.C., Holly I. Holder, Priscilla S. Fulmer, Denver, CO, Attorneys for Amicus Curiae Rangeview Metropolitan District.

Krassa, Madsen & Miller, LLC, Robert F.T. Krassa, Boulder, CO, Attorneys for Amicus Curiae Parker Water and Sanitation District.

Michael A. Lucas, County Attorney, M. Cole Emmons, Assistant County Attorney, Merrill, Anderson, King & Harris, LLC, Paul G. Anderson, Special Water Rights Counsel, Colorado Springs, CO, Attorneys for Amicus Curiae Board of County, Commissioners of the County of El Paso, CO.

Friedlob, Sanderson, Raskin, Paulson & Tourtillott, LLC, William B. Tourtillott, Matthew G. Paulson, Petrock & Fendel, PC, Frederick A. Fendel, III, Denver, CO, Attorneys for Amicus Curiae for the East Cherry Creek, Valley Water & Sanitation District.

Carlson, Hammond & Paddock, L.L.C., William A. Paddock, Denver, CO, Attorneys for Amicus Curiae for Rio Grande Water Users Association.

Hill & Robbins, P.C., David W. Robbins, Dennis M. Montgomery, Denver, CO, Attorneys for Amicus Curiae Rio Grande Water Conservation District.

Moses, Wittemyer, Harrison and Woodruff, P.C., David L. Harrison, Boulder, CO, Attorneys for Amicus Curiae Conejos Water Conservancy District.

No appearance by or on behalf of: Henry J. Berryhill, Jr.; Town of Crested Butte; City of Delta; City of Montrose; City of Grand Junction; Tri–State Generation and Transmission Association, Inc.; Crested Butte Water and Sanitation District; East River at Almont Property Owners Association; Gunnison Angling Society; Gunnison County Electric Association; National Wildlife Federation; Western Colorado Congress; Mr. and Mrs. Charles Reeder; Virgil and Lee Spann Ranches, Inc.; Three Rivers Resort, Inc.; Joseph P. Vader; Raymond R. Van Tuyl; Charles Richard Collard; Thomas E. Collard and Taylor Park Pool Association.

Justice KOURLIS delivered the Opinion of the Court.

The Board of County Commissioners of the County of Arapahoe appeals the judgment of the District Court, Water Division No. 4 (the water court) denying and dismissing with prejudice Arapahoe County's applications for decrees for conditional water rights for the Union Park Reservoir Project (the Project)—a large water storage project west of the Continental Divide in the Upper Gunnison River Basin.

Arapahoe County and various amici (Arapahoe) argue that the Gunnison River Basin above the Aspinall Unit contains ample water resources for its own appropriation to provide for the transbasin diversion of water across the continental divide for ultimate use on Colorado's Front Range. The water court concluded that there was insufficient water available in the Basin for Arapahoe's proposed diversions. Because the water court properly honored the operation of Colorado decrees adjudicating water to the United States for the Aspinall Unit when computing available water in the Gunnison River Basin, we affirm.

■ Specifically, we hold that the United States has an absolute decree for the Aspinall Unit water rights and has historically put the full decree to beneficial use. Hence, the Decree represents a senior water right for 1,224,460 acre-feet, subject to certain conditions. First, the United States has agreed to subordinate [1] 60,000 acre-feet of water to junior in-basin water users. Second, the United States has agreed to release water from the Aspinall Unit as necessary to allow Colorado to meet its Colorado River Compact (Compact) delivery obligation at Lee Ferry, near the northern border of Arizona. Lastly, the United States has agreed to make 240,000 acre-feet of the Aspinall Unit decreed water available for contractual use by future Colorado water users.

Once the Aspinall Unit is taken into account, the Gunnison River Basin does not contain enough unappropriated water for the Project. Therefore, Arapahoe does not satisfy the "can and will" requirement of a conditional decree.

Additionally, we determine that our holding in the appeal renders the cross-appeal raised by Crystal Creek Homeowners' Association and certain other Appellees (Opposers) [2] moot.

Accordingly, we affirm the judgment of the water court.

## I. INTRODUCTION

In 1984, Natural Energy Resources Co. (NECO) obtained a conditional decree for the Union Park Reservoir Project for 325,000 acre-feet. See Case No. 82CW340. In Case No. 86CW226, NECO sought to increase the conditional water rights for the Project. If constructed as planned on Lottis Creek, a tributary of the Taylor River, the Union Park Reservoir described in Case No. 86CW226 would have a capacity of 900,000 acre-feet. The district court concluded that NECO sought a speculative appropriation, and dismissed most of the conditional application seeking the increase. See § 37–92–103(3)(a), 10 C.R.S. (2000).

Arapahoe acquired the rights to the Project from NECO. Arapahoe then filed an application in Case No. 88CW178, again seeking increased conditional water rights for the Union Park Reservoir. The application listed municipal, domestic, commercial and industrial, recreational, fish and wildlife

---

1. "Subordination," in the context of state water distribution, carries essentially the same meaning as it does in real estate mortgages. A subordination agreement is one in which the holder of an otherwise senior water right consents to stand in order of priority behind another person or persons holding a junior water right.

2. Opposers include the Colorado River Water Conservation District, the City of Gunnison, the Crystal Creek Homeowners Association, the Cockrell Trusts, the United States of America, the

Upper Gunnison River Water Conservancy District, the Virgil and Lee Spann Ranches, State of Colorado and Division Engineers, the County of Gunnison, the National Wildlife Federation, the Gunnison Angling Society, the Western Colorado Water Congress Rainbow Services, Inc., and the High Country Citizens Alliance, among others. Of those Opposers, Crystal Creek Homeowners Association and Milton Graves, Charles Hubbard, and Nancy Williams, Trustees filed the cross-appeal.

propagation, reservoir evaporation replacement, and hydroelectric power generation as its beneficial uses.[3] The application differed little from that filed by NECO except for the name of the applicant. It explained that Lottis Creek, the Taylor Park Reservoir Pumping Plant, the Willow Creek Collection System, and the Bertha Gulch Tunnel would supply the reservoir. On November 30, 1990, Arapahoe filed an amendment to its application, adding requests for conditional water rights at alternate points of diversion.[4]

■ Arapahoe plans to store water in the reservoir and divert it for transbasin use in Arapahoe County or in other areas that contract with Arapahoe County for water. The removal of such a large quantity of water from its natural basin alarmed a number of people within the Gunnison River Basin, many of whom either had water rights senior to those of Arapahoe or contemplated future uses on the Western Slope.[5]

The proposed Union Park Reservoir is located on Lottis Creek, a tributary of the Taylor River. The Taylor River and the East River join to form the Gunnison River near the City of Gunnison. The Union Park Reservoir would lie upstream from the Aspinall Unit. The Aspinall Unit is located on the Gunnison River, upstream from the Black Canyon and downstream from the City of Gunnison. Three dams make up the Aspinall Unit. Blue Mesa Reservoir, the largest of the three, lies the furthest upstream, the next highest reservoir is Morrow Point Reservoir, and finally, Crystal Reservoir lies closest to the Black Canyon.

Because of the complexity of the case, and the uncertainty surrounding the availability of water for appropriation, the water court bifurcated the first trial. In Phase One, the parties litigated the availability of water for

the Project. The water court ruled that the Gunnison River Basin did not have sufficient water available for the Project. Therefore, the parties did not reach Phase Two—the examination of Project feasibility.

The water court reasoned that the "can and will" doctrine required Arapahoe to prove that the Basin had enough unappropriated water to satisfy the requested conditional water right. Thus, Phase One consisted of a month-long trial[6] in which the parties presented evidence on the amount of water available for appropriation at the specified diversion sites. The water court found that the Basin contained not more than 20,000 acre-feet available for appropriation, and dismissed the application because Arapahoe conceded that this quantity would not sustain the Project. The water court published its conclusions in its Findings of Fact, Conclusions of Law, and Judgment and Decree on October 21, 1991.

Arapahoe appealed to this court. We held that the water court improperly assumed that all major senior conditional water rights would become absolute, and that holders of absolute water rights would divert their maximum amount of decreed water. *See In re Board of County Comm'rs*, 891 P.2d 952, 958 (Colo.1995) (*Arapahoe I* ). Because the water court's assumptions impacted the quantity of water available for appropriation on the river, we remanded the case with directions back to the water court for determination of the availability of water for a new appropriation by Arapahoe consistent with our holding. *See id.* at 956–57.

The water court concluded that our decision so undermined the results of the first trial that it required a new, second trial on water availability. The water court limited the issues in the second trial to those related directly to water availability. The court re-

---

3. The application also proposed adding recreation, fish and wildlife, and evaporation replacement to the power generation purposes previously decreed in Case No. 82CW340. The trial court denied this request in the first trial and Arapahoe did not renew this request in the second.

4. Arapahoe filed an amendment requesting conditional water rights for the Project at alternate diversion points on November 30, 1990. It filed another amendment to the application on May

31, 1995. These amendments do not affect our holding.

5. Colorado statutes and our case law permit citizens and the State Engineer to maintain statements of opposition in water cases, along with the holders of water rights. *See Shirola v. Turkey Cañon Ranch*, 937 P.2d 739, 747 (Colo.1997).

6. The trial took place in June and July of 1991.

stricted testimony to evidence reflecting river conditions at the time Arapahoe filed its applications—December 30, 1988 and November 30, 1990. The water court's decisions regarding the legal issues that we did not review in the first appeal remain the law of the case except to the extent the water court reconsidered those rulings.

In the second trial, the water court found only 15,700 acre-feet as an average annual yield available to the Project. Arapahoe offered expert testimony that it could divert significantly more water out of the basin without negatively affecting senior water rights, but the water court held that Arapahoe's expert failed to incorporate proper legal assumptions into his analysis. Hence, as in the first trial, the water court did not proceed to Phase Two.

Arapahoe raises six issues in its appeal of the second trial results:

A. Whether the water court properly followed this court's mandates in applying the "can and will" test to determine water availability.

B. What effect should the Colorado River Storage Project have on water availability in Colorado.

C. Did the water court follow this court's mandates in its consideration of existing water rights to determine water availability.

D. Should the water court have dismissed Arapahoe's conditional water right claim for a conditional water right for its pumping plant because it does not have an existing permit for that facility.

E. What condemnation powers may Arapahoe rely upon to show water availability.

F. Did the water court err by allowing a witness to testify extensively as an expert after he was endorsed only as a limited fact witness.

Additionally, some Opposers raise the following issue on cross-appeal: whether the Compromise Flow Rates in the 82CW340 Stipulation apply only to the exercise of the water rights decreed in Case No. 82CW340.

## II. HISTORY OF INTERSTATE COMPACTS

Before examining the issues before us, it is important to outline the history of the interstate compacts affecting the flow of the Colorado River to which the Gunnison River is tributary.

The Colorado River flows for 1400 miles through the western United States before reaching the Gulf of California. *See* James N. Corbridge, Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law* 540 (rev. ed.1999). The Colorado River drains a 242,-000 square mile area including parts of seven states—Colorado, Wyoming, Utah, New Mexico, Nevada, Arizona, California—and Mexico. *See id.* at n. 165. Colorado contributes approximately seventy percent of the virgin flow of the Colorado River. *See Hearings Before the Subcomm. on Irrigation and Reclamation of the Comm. on Interior and Insular Affairs on H.R. 3300 and Similar Bills, House of Representatives,* 19th Cong., 1st Sess. 521, 522 (1967) (Testimony Governor John Love of Colorado). The United States Supreme Court held that the prior appropriation doctrine controlled when determining the equitable share of a river's water as between states following the doctrine. *See Wyoming v. Colorado,* 259 U.S. 419, 470, 42 S.Ct. 552, 66 L.Ed. 999 (1922); *see generally Kansas v. Colorado,* 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907) (establishing the principles from which equitable apportionment evolved). These opinions led Colorado water law experts, notably Delph Carpenter, to recognize that the prior appropriation doctrine, if utilized as the basis for interstate allocation decisions, could subject Colorado to a substantial loss of Colorado River water to downstream users.

California, which followed a mixture of the prior appropriation and riparian doctrines, and other Lower Basin states were developing their uses of water at a far greater pace than Colorado.[7] *See* Corbridge & Rice, *su-*

---

7. All of the other members of the Colorado River Compact followed the prior appropriation doc-

trine. *See* Corbridge & Rice, *supra* at 541.

*pra,* at 541. Thus, California's growth was seen as a threat to the amount of water Colorado could eventually divert for beneficial consumptive uses within its water boundaries.

Faced with unfavorable Supreme Court precedent, Carpenter and leaders from other Colorado River states sought an agreement allocating the beneficial consumptive use of water in the Colorado River. *See* Daniel Tyler, *Delphus Emory Carpenter and the Colorado River Compact of 1922,* 1 Denv. U. Water L.Rev. 228, 237 (1998). The Colorado River Compact emerged from their negotiations.

The Compact divided the Colorado River into Upper and Lower Basins at Lee Ferry on the Colorado River in northern Arizona. *See* § 37–61–101, art. II(f), 10 C.R.S. (2000). California, Nevada, Arizona, and small portions of Utah and New Mexico make up the Lower Basin states. *See id.* art. II(g). The Upper Basin states include Colorado, Wyoming, Utah, New Mexico, and a small section of Arizona above Lee Ferry. *See id.* art. II(f).

Based on calculations of water availability at the time of drafting, the Compact divided the average annual water availability approximately in half. *See* James S. Lochhead, *The Perspective of the State of Colorado in 1922: Did We Get What We Bargained For?,* Colorado River Compact Symposium Proceedings 184, 190 (Water Education Foundation May 28–31, 1997). Specifically, the Compact allocated to each of the two basins 7,500,000 acre-feet annually for exclusive beneficial consumptive use.[8] *See* § 37–61–101, art. III(a), 10 C.R.S. (2000). The Compact also allowed the Lower Basin to increase its annual consumptive use by 1,000,000 acre-feet. *See id.* art. III(b). In furtherance of this entitlement, the Upper Basin is required to deliver 75,000,000 acre-feet of water to the Lower Basin in consecutive ten-year periods. *See id.* art. III(d). The Compact provides that "[t]he provisions of this article shall not apply to or interfere with the regulation and control by any state within its boundaries of the appropriation, use and distribution of water." *Id.* art. IV(c).

California, Nevada, New Mexico, Wyoming, Utah, and Colorado signed the Compact in 1922. Those states hoped Arizona would sign the Compact as well, but Arizona refused to ratify it based on concerns that California would hoard the Lower Basin's allocated water. *See* 1 John Upton Terrell, *War for the Colorado River, the California–Arizona Controversy* 20–21 (1965). The signing states attempted to form a six-state agreement, without Arizona, but California refused to join unless the federal government authorized the construction of a 20,000,000 acre-foot storage and hydroelectric dam. *See* Corbridge & Rice, *supra,* at 543. This demand eventually led to the enactment of the Boulder Canyon Project Act (the Boulder Act) in 1928. *See* 43 U.S.C. §§ 617–619b (1994). In addition to authorizing the Compact, the Boulder Act authorized both the construction of the Hoover Dam, the major reservoir in the Lower Basin, and the All American Canal to benefit the Imperial Valley. *See* U.S.C. § 617. In exchange for passing the Boulder Act, California passed its own Limitations Act, *see* 1929 Cal. Stat. ch. 16, p. 38–39, which limited California's share of the Lower Basin's annual apportionment to 4,400,000 acre-feet, plus not more than one-half of any surplus waters. *See* 43 U.S.C. §§ 617c, 1525 (1994); *see also* Corbridge & Rice, *supra,* at 543. On June 25, 1929, the Compact became operative upon President Hoover's approval of the Boulder Act. *See* Terrell, *supra,* at 25.[9]

Because the vast majority of the allocated water flows from the mountains during spring snowmelt, both Basins recognized the need to establish a reservoir system to collect and store water during wet years for use in dry years, and to regulate the flow of water throughout the year. *See generally* 43 U.S.C. §§ 617 & 620 (1994) (discussing the

---

8. Unfortunately for the Upper Basin, 7,500,000 acre-feet overestimates the actual quantity of available Colorado River water during many years, due to variations in rainfall, snowfall, and resulting run-off.

9. Arizona finally signed the Compact in 1944, largely because it desired federal funds for in-state water projects. *See* Corbridge & Rice, *supra,* at 545.

purposes for reservoirs in the Lower Basin and Upper Basin, respectively).

The Upper Colorado River Compact, signed by the Upper Basin states on October 11, 1948, apportioned Upper Basin water among the Upper Basin states. *See* §§ 37–62–101 to –106, 10 C.R.S. (2000). This Compact accorded Colorado 51.75% of the available water for use by the Upper Basin after making a 50,000 acre-foot deduction for use by Arizona. *See* § 37–62–101, art. III(a)(2). New Mexico, Utah, and Wyoming received 11.25%, 23.00%, and 14.00% respectively.[10] *See id.*

In 1956, Congress passed the Colorado River Storage Project Act (CRSPA). *See* 43 U.S.C. §§ 620–620o (1994). This act authorized the construction of several dams in the Upper Basin, including Glen Canyon, Flaming Gorge, Navajo, and the Wayne N. Aspinall Unit (previously Curecanti). *See id.* § 620. Congress enacted CRSPA to assist the Upper Basin states in developing their allocation of water, producing hydropower, and ensuring Compact deliveries, among other uses. *See id.* CRSPA significantly affects the matter before us because it authorized the construction of the Aspinall Unit.

## III. DISCUSSION OF THE ISSUES ON APPEAL

### A. APPLICATION OF THE "CAN AND WILL" DOCTRINE

■ With this background, we now turn to the issues on appeal. Initially, Arapahoe challenges the water court's application of the "can and will" doctrine in part based on an argument that our 1995 decision in *Arapahoe I* effectively required the water court to find more water available for appropriation in the Gunnison River Basin than it had found in the first trial.

■ Colorado policy seeks to optimize the beneficial use of all available waters of the state. *See Matter of Rules & Reg. Gov. Use, Control & Protection of Water Rights,* 674 P.2d 914, 935 (Colo.1983). We have interpreted the "can and will" doctrine accordingly. *See* § 37–92–305(9)(b), 10 C.R.S.

(2000) (establishing the "can and will" doctrine); *see also Arapahoe I,* 891 P.2d 952 *passim.* The "can and will" doctrine requires a conditional water right applicant to show a "substantial probability that within a reasonable time the facilities necessary to effect the appropriation can and will be completed with diligence, and that as a result waters will be applied to a beneficial use." *See id.* at 961–62. Accordingly, the applicant must prove, taking into account actual operation of decrees, that the river contains sufficient unappropriated water for the applicant to complete the appropriation diligently and in a timely manner. *See id.* at 962. When applying the "can and will" doctrine, courts should consider only the historical use of absolute water rights, and may not consider conditional water rights under which no diversions have been made. *See id.*

The application date for conditional water rights determines priority among conditional water rights applied for in different years. *See* § 37–92–306, 10 C.R.S. (2000). As a general rule, an earlier application generates an earlier priority for purposes of State and Division Engineer administration. *See id.* Once an applicant completes an appropriation with reasonable diligence by placing the water to beneficial use, the appropriation date relates back to when the applicant completed the first step in the appropriation process. *See* § 37–92–305(1), 10 C.R.S. (2000); *Dallas Creek Water Co. v. Huey,* 933 P.2d 27, 35 (Colo.1997); *City of Thornton v. City of Fort Collins,* 830 P.2d 915, 924–25 (Colo.1992).

Arapahoe fails to recognize that our 1995 opinion did not examine the factual issues about actual diversions taking place in the Gunnison River Basin. Our 1995 decision led the water court to conduct a second trial focused solely on the quantity of water available for appropriation. However, we clearly did not mandate any particular findings about available water; rather, we set out standards for the water court to use in arriving at those findings. The water court heard new testimony from both sides based on new models of river conditions established by three expert witnesses. Those witnesses constructed the models within the constraints

---

**10.** These percentages do not attach to any extra water available in wet years. *See id.*

imposed by the water court based upon our 1995 decision, and testified to different water availability totals than in the first trial.

■ The water court relied on the evidence presented to it, which supports the decision at issue here. The water court found that Opposers' experts offered more reliable calculations than did Arapahoe's expert. Such a determination is wholly within the water court's discretion as a trial court. *See Municipal Subdist., Northern Colo. Water Conservancy Dist. v. Getty Oil Exploration Co.*, 997 P.2d 557, 561 (Colo.2000). We accept the trial court's findings because the record supports them.

## B. COLORADO RIVER STORAGE PROJECT ACT

Further, Arapahoe contends that the water court misapplied CRSPA and the Compact. It argues that CRSPA does not preclude additional appropriation on the Gunnison River under present conditions. Because CRSPA specifically states that Congress enacted it to assist the Upper Basin in developing its Compact apportionment, *see* 43 U.S.C. § 620, Arapahoe argues that the water court should allow new appropriators to divert water from the Gunnison River to the Front Range without regard to the Aspinall Unit decrees.

Arapahoe claims that the Gunnison River Basin offers a rich source of water for diversion to the Front Range, the center of Colorado's population growth, and that such diversions and attendant beneficial use would facilitate development of waters apportioned to Colorado by the 1922 and 1948 Compacts.

## 1. PURPOSE OF COLORADO RIVER STORAGE PROJECT ACT

■ Arapahoe argues that Congress did not want CRSPA reservoirs with state water rights decrees to restrict development of Colorado's Compact apportionment by junior water rights holders. We agree with the principle Arapahoe argues, but disagree as to its application.

Because of varying weather conditions in the Rocky Mountains, the natural flow of the Colorado River varies from four to twenty-two million acre-feet annually at Lee Ferry. *See* Water and Power Resources Service, *Project Data* 360, Dep't of Interior (1981). Reservoirs allow water retention when flows are high. Then, when flows subside, that water can be released into the river to allow Colorado to meet its Compact obligations at Lee Ferry. Having a savings account in the form of the Aspinall Unit reservoirs allows Colorado water users to develop and use the water allotted to them by the Compact without fear of being "called out" at some time by the demands of the Compact.[11] *See id.* at 360–361.

With that in mind, the United States Congress enacted ˜CRSPA. *See* 43 U.S.C. §§ 620–620o. Congress approved the construction and operation of several dams and reservoirs, including the Aspinall Unit, for the nonexclusive purposes of

> regulating the flow of the Colorado River, storing water for beneficial consumptive use, making it possible for the States of the Upper Basin to utilize, consistently with the provisions of the Colorado River Compact, the apportionments made to and among them in the Colorado River Compact and the Upper Colorado River Basin Compact, respectively, providing for the reclamation of arid and semiarid land, for the control of floods, and for the generation of hydroelectric power, as an incident of the foregoing purposes.

*Id.* § 620. Congress also stated that it did not intend for CRSPA to impede the Upper Basin's development of the water apportioned to it by the Compact. *See id.* § 620b (1994).

We agree that the CRSPA reservoirs are part of a plan to allow Colorado to develop and preserve Compact apportionment. However, we find that the stored water provides Colorado with an ability to satisfy the Compact delivery mandates without eroding other rights decreed to beneficial use in the state.

---

**11.** The Assistant Secretary of the Interior explained that more than two-thirds of the annual flow at Lee Ferry passes during April, May, June,

and early July. *See* H.R. Doc. No. 364, 83d Cong., 2d Sess., at 141 (1954).

*See* H.R. Doc. No. 201, at 31 (1959). By banking CRSPA water for Compact deliveries and using the reservoirs for their other decreed purposes, Colorado continues development of its water entitlements. *See id.* The Aspinall Unit holds absolute decrees, and a right to use the water for the decreed purposes—including hydropower generation. Contrary to Arapahoe's assertion, we do not view those waters as being available for appropriation.

a. ECONOMIC REQUIREMENTS OF COLORADO RIVER STORAGE PROJECT ACT

Our conclusion is based, in part, on a recognition that before construction of the Aspinall Unit, Congress sought assurances that the project would both pay for itself and generate future profits. The Secretary of the Interior directed evaluations of the economic possibilities related to the Aspinall Unit.[12] The 1959 Report resulted from the first study. *See generally* H.R. Doc. No. 201 (1959). The 1959 Report stated that the two highest reservoirs, Blue Mesa and Morrow Point, appeared economically sound, and commented that Crystal Reservoir could also prove financially beneficial for the United States. *See id.* at iii. The 1959 Report considered five other in-Basin projects that would require Aspinall to subordinate 60,000 acre-feet of water, and specifically contemplated reducing the Unit demands according-

ly. *See id.* at 15. The 1959 Report allocated a 40,000 acre-foot depletion above Blue Mesa, and an additional 10,000 acre-foot depletion above each of the other two reservoirs. *See id.* The 1962 Economic Justification Report, focusing primarily on the Crystal Reservoir's economic justification, also referenced this 60,000 acre-foot annual depletion allowance.[13] *See* H.R. Doc. No. 77, at 10 (1963).

Hence, at no time in the planning stages do we find mention of an intent to subordinate any additional waters to junior appropriators. Rather, we find an expectation that the Unit would continue to produce hydropower in order to generate income to pay for the construction.

b. ACQUISITION OF ASPINALL UNIT WATER RIGHTS

During the time the Unit was being planned and constructed, the United States had not conceded that state courts had jurisdiction to adjudicate water rights belonging to the United States.[14] Therefore, the United States, acting through the Bureau of Reclamation (BUREC), refused to submit its water claims for the Aspinall Unit reservoirs to the Colorado state courts. The Colorado River Water Conservation District[15] (the River District) wanted to protect senior water rights in the basin by adjudicating state-decreed priorities for the federal project. Therefore, the River District negotiated with the United States for the River District to

12. Plans for the Aspinall Unit discussed two versions. One consisted of three in-line reservoirs, the other of only two. The Secretary of the Interior investigated the economic feasibility of both configurations.

13. Construction of the Aspinall Unit commenced by survey on November 13, 1957, before the conclusion of the economic studies. *See* Decree in Civil Action No. 6981, Water District No. 62 (May 4, 1961). Actual dam construction at Blue Mesa started in July 1960, and at Morrow Point and Crystal thereafter. *See* H.R. Doc. No. 77, 88th Cong., 1st Sess., at iii (1963).

14. The "Colorado Trilogy" under which the Supreme Court established that the United States and Native American tribes, when properly joined under the 1952 McCarran Amendment, must bring their water claims in state court were decided in the 1970s. *See United States v. Eagle County*, 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d

278 (1971); *United States v. Water Div. 5*, 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284, (1971); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

15. The Colorado General Assembly created the Colorado River Conservation District in 1937. *See* 1937 Colo. Sess. Laws 997. The District is a corporate body as well as a political subdivision of the state. *See* § 37–46–102(2), 10 C.R.S. (2000). The legislative purpose for creating water conservation districts is the conservation of Colorado's water resources for storage, irrigation, mining, manufacturing, and reclamation through the construction or reservoirs, ditches, and irrigation works. *See* § 37–46–101, 10 C.R.S. (2000). Specifically, the legislature created the Colorado River Water Conservation District to develop the water resources of the Colorado River and its tributaries. *See* § 37–46–103, 10 C.R.S. (2000).

obtain appropriative water rights in the state courts for the Aspinall Unit. *See* Case No. 6981. The River District reasoned that adjudication would alleviate local concerns that BUREC could harm existing rights by attempting to claim priorities senior to rights decreed in Colorado courts.

The River District applied for conditional water rights for the Aspinall Unit. The application sought water rights for the benefit of in-basin users for the following beneficial purposes: domestic and municipal uses, irrigation and stock watering, industrial, power, flood control, piscatorial, wildlife protection and preservation, and recreational purposes. The water court awarded the conditional decrees and the River District then assigned those conditional water rights to the United States in 1962. The assignment contained language expressing the River District's desire that BUREC use the water stored in the Aspinall Unit in a manner consistent with development in the Gunnison Basin.[16]

On December 11, 1980, the water court entered absolute decrees in favor of the United States for the Aspinall Unit in Case No. 80CW156, for both storage and hydropower at each reservoir. Combined, the decrees totaled 1,224,460 acre-feet of storage.

## 2. APPLICATION OF ASPINALL UNIT'S BENEFICIAL USES

Arapahoe contends that the Aspinall Unit's operations cannot preclude in-state water users from developing the Basin's water resources. The water court found that BUREC stored and released water from the Aspinall Unit not only for hydropower, but for other beneficial purposes, including flood control, fish and wildlife, recreation, irrigation, and domestic uses, under the appropriative rights for the Unit. Hence, in establishing the parameters for water availability based on our 1995 decision, the water court properly ordered the parties to respect the historic exercise of the Aspinall absolute decrees for all its beneficial uses.

16. The assignment agreement stated: "This assignment is made by the District and accepted by the United States upon the condition that the water rights assigned will be utilized for the

## a. HYDROPOWER

Arapahoe contends that CRSPA supports its view that Congress intended hydropower as an incidental use for water stored and released in the Aspinall Unit, even though power generation provided most of the project's original economic justification.

Arapahoe argues that CRSPA section 620 reflects Congressional intent to subrogate the generation of hydropower to other CRSPA uses, and that section 620b provides that Congress did not intend for the authorized projects to interfere with the Upper Basin States' comprehensive development of their apportioned water. *See* 43 U.S.C. §§ 620, 620b. Arapahoe posits that these provisions alone demand the subordination of hydropower generation to other beneficial uses in Colorado.

Additionally, Arapahoe explains that although hydropower generation largely justified the Aspinall Unit's construction, the 1962 Economic Justification Report (the 1962 Report) contemplated reduced power generation, in addition to the initial 60,000 acre-feet of water subordination, after the year 2020. "[T]he [Aspinall] unit was made to share a gradual decrease in the firm power generation of the system that would result from increased upper basin depletions after 2020." H.R. Doc. No. 77, at 10 (1963).

The Ninth Circuit commented on this issue in *Arizona Power Authority v. Morton*, 549 F.2d 1231 (9th Cir.1977). In *Morton*, the court of appeals heard argument regarding the allocation of power produced at CRSPA reservoirs. *See id.* at 1232. Although the Ninth Circuit did not decide this issue, the court explained:

Although CRSP describes the generation of hydroelectric power as "an incident" of the storing of water for flood control, reclamation and other consumptive uses, power production is nevertheless a principal purpose of the legislation. Congress intended CRSP hydroelectric power to serve ... as a revenue producer that would repay the federal investment in the power

development and operation of the Curecanti Unit in a manner consistent with the development of water resources for beneficial use in the natural basin of the Gunnison River."

features of the project.... Congress considered power revenues to be the most important aspect of CRSP.

*Id.* at 1236 (citations omitted); *see also* H.R.Rep. No. 1174, 83d Cong., 2d Sess., at 11 (1954); H.R.Rep. No. 1087, *reprinted in* 1956 U.S.C.C.A.N. 2346, 2354–59. We find the reasoning of the Ninth Circuit persuasive, especially regarding the Aspinall Unit. Without the revenues from power sales, Congress might not have approved the Aspinall Unit. The generation of hydropower can only be considered a primary purpose of CRSPA, at least as a basis to recover the Aspinall Project's costs.

We do not dispute that Congress contemplated that annual flows into the Aspinall Unit would decrease as other upstream projects came on-line, but Congress's consideration of other projects does not change our understanding of the significance of hydropower to the overall feasibility of the Aspinall Unit. In any event, as we discuss below, the upstream consumption of water as contemplated by Congress does not include Arapahoe's proposed plans.

### i. COLORADO LAW REGARDING HYDROPOWER AS A BENEFICIAL USE

The United States has absolute decrees for the Aspinall Unit. The decrees permit power generation, and Colorado law defines power generation as a legitimate beneficial use. *See* § 37-95-103(2), 10 C.R.S. (2000). Thus, senior water rights for hydropower generation may place a call on the river. The General Assembly, and our 1995 decision in this case, did not set forth any different treatment for hydropower rights.

In the second trial, the water court gave effect to the state water rights for the Aspinall Unit in order of the decrees. We agree that federal preemption does not provide otherwise. *See California v. United States,* 438 U.S. 645, 678, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). The water court recognized that CRSPA authorized the construction of the Aspinall Unit only after economic justification of the project. *See* 43 U.S.C. § 620. Therefore, the water court directed the parties to model the conditions of the river, including the historical use of water by Aspi-

nall Unit for all of its decreed purposes, despite references in CRSPA that characterize hydropower generation as an incidental use. The historical use of the full decreed amount by the Aspinall Unit within Colorado for its decreed purposes prevents Arapahoe County from claiming any portion of the appropriated water for its project.

### ii. RELATIONSHIP OF HYDROPOWER TO OTHER BENEFICIAL USES

 Arapahoe further contends that section 620f of CRSPA directs that storage and use of water for the generation of power by CRSPA reservoirs should not impair upstream junior appropriation of water for domestic or agricultural use. Arapahoe relies on the following text from section 620f:

> Subject to the provisions of the Colorado River Compact, neither the impounding nor the use of water for the generation of power and energy at the plants of the Colorado River storage project shall preclude or impair the appropriation of water for domestic or agricultural purposes *pursuant to applicable State law.*

43 U.S.C. § 620f (1994)(emphasis added). Arapahoe also argues that, in addition to the statute's plain language, CRSPA's legislative history supports Arapahoe's contentions.

> The full utilization of water apportioned to the Upper Basin is not expected for about 75 years. In the meantime, any water that is neither consumed in the upper basin nor required for the initial filling of project reservoirs will flow through project power plants in route to Lee Ferry. These unused flows could be regulated in project reservoirs as desired for maximum firm-power generation.

H.R. Doc. No. 364, at 163 (1954).

Like Congress, Colorado intended that hydropower would not interfere with its own development of water upstream from Lee Ferry. "Specific provision should be made in authorizing legislation to assure that no rights vest in the use of water for power generation in units of the project which will prevent or handicap the beneficial consumptive use upstream of the waters of the Colorado River system to which any upper basin

State is entitled." *Hearings Before the Subcomm. on Irrigation and Reclamation of the Comm. on Interior and Insular Affairs House of Representatives,* 84th Cong., pt. 1, at 422 (1955).

The water court ruled that section 620f applies only to interstate compact entitlements to protect allocations. We agree.

The full text of section 620f reads as follows:

> The hydroelectric powerplants and transmission lines authorized by this chapter to be constructed, operated, and maintained by the Secretary shall be operated in conjunction with other Federal powerplants, present and potential, so as to produce the greatest practicable amount of power and energy that can be sold at firm power and energy rates, but in the exercise of the authority hereby granted he *shall not affect or interfere with the operation of the provision of the Colorado River Compact, the Upper Colorado River Basin Compact,* the Boulder Canyon Project Act, the Boulder Canyon Project Adjustment Act, and any contract lawfully entered into under said Compacts and Acts. *Subject to the provisions of the Colorado River Compact,* neither the impounding nor the use of water for the generation of power and energy at the plants of the Colorado River storage project shall preclude or impair the appropriation of water for domestic or agricultural purposes *pursuant to applicable State law.*

43 U.S.C. § 620f (1994) (citations omitted) (emphasis added). Section 620f plainly states that CRSPA's hydroelectric powerplants shall not interfere with the other major compacts affecting the Upper Basin, nor the appropriation of water for domestic and agricultural purposes under state law.

In this case, the other major compacts impacting the Upper Basin are the Colorado River Compact and the Upper Basin Compact. Section 620h of CRSPA specifically demands that courts interpret CRSPA consistently with the Colorado River Compact and the Upper Colorado River Basin Compact. *See* 43 U.S.C. § 620h (1994).

Article IV(c) of the Colorado River Compact provides that "[t]he provisions of this article shall not apply to or interfere with the regulation and control by any state within its boundaries of the appropriation, use and distribution of water." § 37–61–101, art. IV(c), 10 C.R.S. (2000). This provision defers to Colorado's water law.

Additionally, the Upper Basin Compact states that "the provisions of this compact shall not apply to or interfere with the right or power of any signatory state to regulate within its boundaries the appropriation, use and control of water, the consumptive use of which is apportioned and available to such state by this compact." § 37–62–101, art. XV(b), 10 C.R.S. (2000) (also referring to storage and use of water for generation of electrical energy). Thus, the hydropower components of both compacts defer to state law.

■ Colorado law provides for priority administration of decreed hydropower appropriative rights within the state. *See Rocky Mountain Power Co. v. White River Elec. Ass'n,* 151 Colo. 45, 51–52, 376 P.2d 158, 161 (1962). Congress clearly expressed its intent that the hydropower features of CRSPA neither operate to prevent the Upper Basin States from meeting their Compact requirements at Lee Ferry, nor to change the Upper Basin state allocation of waters. On the other hand, Congress deferred to state law for deciding and administering appropriative rights within the boundaries of each state. Congress did not intend to create a different law for the Aspinall Unit.

We conclude that the water court did not err in giving effect to the hydropower water rights of the Aspinall Unit for purposes of determining availability of water for junior conditional rights under the "can and will" test.

b. FLOOD CONTROL

■ Colorado law also identifies flood control as a beneficial use. *See Pueblo West Metro. Dist. v. Southeastern Colo. Water Conservancy Dist.,* 689 P.2d 594, 603 (Colo. 1984). We reject Arapahoe's argument that operation of the Aspinall Unit for flood con-

trol purposes results in a waste of water and that Arapahoe should be able to appropriate water that would otherwise be evacuated from the Aspinall Unit in the flood control operation. CRSPA provides for flood control as one of the purposes of its authorized reservoirs. *See* 43 U.S.C. § 620. The United States holds state appropriative rights and decrees for "flood control" purposes and may exercise them along with all other decreed uses of the project.

## c. FISH AND WILDLIFE AND RECREATIONAL USES

Arapahoe also addresses the United States' impoundment and release of water from the Aspinall Unit for fish and wildlife and recreational uses. Arapahoe contends that Congress intended those uses, like power generation, as incidental uses that would be subordinate to junior upstream water rights. Arapahoe cites a Tenth Circuit case, *Jicarilla Apache Tribe v. United States,* 657 F.2d 1126 (10th Cir.1981), in support of this position. In *Jicarilla,* the Tenth Circuit found that fish and wildlife and recreation were beneficial uses only when consistent with the primary purposes of the project. The court relied in part on 43 U.S.C. § 620g (1994) in reaching its conclusion, providing:

> [T]he Secretary is authorized and directed to investigate, plan, construct, operate, and maintain (1) public recreational facilities on lands withdrawn or acquired for the development of said project or of said participating projects, to conserve the scenery, the natural historic, and archeologic objects, and the wildlife on said lands, and to provide for public use and enjoyment of the same and of the water areas created by these projects *by such means as are consistent with the primary purposes of said projects;* and (2) facilities to mitigate losses of, and improve conditions for, the propagation of fish and wildlife.

43 U.S.C. § 620g (emphasis added). The 1968 Colorado River Basin Act, 43 U.S.C. § 1501(a) (1994) (the 1968 Act), provides that recreation and fish and wildlife are among Project purposes. The 1968 Act states:

> It is the object of this chapter to provide a program for the further comprehensive development of the water resources of the Colorado River Basin and for the provision of additional and adequate water supplies for use in the upper as well as in the lower Colorado River Basin. This program is declared to be for the purposes, among others, of regulating the flow of the Colorado River; controlling floods; improving navigation; providing for the storage and delivery of the waters of the Colorado River for reclamation of lands, including supplemental water supplies, and for municipal, industrial, and other beneficial purposes; improving water quality; providing for basic public outdoor recreation facilities; improving conditions for fish and wildlife, and the generation and sale of electrical power as an incident of the foregoing purposes.

43 U.S.C. § 1501(a) (1994).

Thus, the 1968 Act authorizes fish and wildlife and recreation as bona fide purposes of the Aspinall Unit. CRSPA section 620g contemplates the accompanying benefit of recreational and fish and wildlife facilities at the proposed Project reservoirs. *See* 43 U.S.C. § 620g. The 1959 and 1962 Economic Justification Reports elaborate on the Aspinall Unit's recreational benefits, suggesting that Congress intended such benefits as a substantial part of the project. *See* H.R. Doc. No. 77, at 16–18, 35–36 (1963); H.R. Doc. No. 201, at 25–26, 55–63 (1960).

Congress's express intent to operate this facility in part for recreational purposes distinguishes this case from *Jicarilla.* Unlike *Jicarilla,* Congress established the Curecanti National Recreation Area at the Aspinall Unit. *See* 16 U.S.C. § 410fff–9 (Supp.1999). Congress invested nearly $30,000,000 in the site and it draws over a million visitors annually. To accommodate the great number of boaters, Blue Mesa must be kept at an adequate level to maximize the navigable surface of the lake.

The *Jicarilla* court rejected the construction of reservoirs solely for recreational purposes. Here, of course, the reservoirs are not solely for recreation. More persuasively, the 1968 Act, not mentioned by the Tenth Circuit in its opinion, as well as the existence of the absolute water rights for recreation

and fish and wildlife support the water court's legal conclusions. Recreation and fish and wildlife are recognized beneficial uses in Colorado. *See May v. United States,* 756 P.2d 362, 371 (Colo.1988). Accordingly, we hold that both because Congress specifically authorized a recreational use and because the recreational use is but one of the purposes of the reservoirs, *Jicarilla* does not apply.

### 3. SUBORDINATION AGREEMENT AND MARKETABLE POOL

Arapahoe argues that the United States subordinated its decreed water rights for the Aspinall Unit to all junior upstream appropriators. This argument raises two separate issues: the scope of the subordination agreement, and the character of the marketable pool.[17] Arapahoe argues that BUREC's acknowledgment that it could reengineer the Unit to accommodate a loss of 240,000 acre-feet amounts to an admission that the water is not being put to beneficial use and should therefore be available for other appropriators. Arapahoe further argues that any other conclusion would defeat the intent of the Compacts. We disagree with Arapahoe. We affirm the water court in its conclusions that the 60,000 acre-feet to which BUREC agreed to subordinate their uses are available only to in-basin users; and the 240,000 acre-foot marketable pool is available for use in-basin or transbasin, but only by contract with BUREC.

### a. SUBORDINATION AGREEMENT

■ Arapahoe argues that the State Engineer's broad interpretation of BUREC's agreement to subordinate dictates that the water court must treat the Aspinall Unit as junior to all upstream appropriators to the extent of 60,000 acre-feet, including transmountain diversions. Arapahoe's modeling expert assumed as much in calculating water availability. We decline to follow the State Engineer's interpretation and note that the

original 60,000 acre-foot subordination agreement clearly dictated that the subordinated water would remain in the Basin.

The water rights decreed for the Aspinall Unit allow BUREC to call most of the water arising above Blue Mesa Reservoir. When the River District transferred the Aspinall Unit water rights to the United States, BUREC agreed to subordinate at least 60,000 acre-feet of Aspinall water rights to junior upstream diversions within the Gunnison River Basin. At the second trial, the water court allowed the litigants to present evidence regarding whether the subordination was limited to 60,000 acre-feet, where diversions could be made, and whether the subordination was limited to depletions made for use within the Upper Gunnison River Basin.

■ The water court concluded that the United States agreed to subordinate its water rights only for the benefit of users within the Upper Gunnison River Basin. Former State Engineer, Dr. Jeris Danielson, explained that he disfavored selective subordination[18] policies and did not enforce them. However, Danielson conceded that BUREC probably intended to subordinate selectively to in-basin users.

Although BUREC agreed to a 60,000 acre-foot subordination, the Upper Gunnison River Water Conservancy District (Gunnison District) questioned whether this quantity of water would suffice in the future. The water court found that BUREC remained open to enlarging the quantity of the subordination without guaranteeing that it would increase the subordination amount in the future. Thus, at present, BUREC must subordinate at least 60,000 acre-feet of its Aspinall decreed water to junior upstream in-basin users.

The Gunnison District feared that, despite any agreement regarding subordination, BUREC could call the river. Therefore, the Gunnison District submitted a contract to BUREC in 1963 that would protect in-basin

---

17. "Marketable pool" represents the amount of water the United States argued before us that it could provide under the Aspinall United decrees and purposes for beneficial use by other parties.

18. "Selective subordination" refers to the subordination by a senior water user to certain junior water users while, at the same time, the senior user denies such permission to other junior appropriators.

junior water rights through subordination. The water court found that BUREC accepted the contract in June 1963.

By the early eighties, the State Engineer viewed the Upper Gunnison Basin as overappropriated when he took the Aspinall Unit's decree into account. The overappropriation controversy reached an impasse when the City of Gunnison filed for seven large capacity well permits. The State Engineer held a meeting on September 27, 1983, to review the subordination policy's impact on well permit filings. The State Engineer and the Division Engineer for Water Division 4 hoped that BUREC would formalize its subordination policy at that time, but BUREC refused to obtain a formal decree documenting its policy.

In a memorandum dated November 15, 1984, the State Engineer declared that he would evaluate well permits above Crystal Reservoir, assuming that the Aspinall Unit's right constituted the most junior right and placed no demand on the river. Additionally, he testified that he assumed that BUREC had previously subordinated its water rights to transbasin diverters. The State Engineer acknowledged that he lacked the authority to compel a water right holder to subordinate, but hoped that his policy would encourage BUREC to adjudicate its subordination policy.

We find the in-basin 60,000 acre-foot subordination by the United States valid. The construction of the Aspinall Unit greatly benefited the Gunnison River Basin, but not without adverse effects. The dams inundated many miles of prime trout fishing and flooded several properties. To offset these losses, the United States agreed to set aside 60,000 acre-feet of water for future projects to benefit the Upper Gunnison River Basin.[19] The United States intended that the future projects would develop water resources for use within the Upper Gunnison River Basin.

■ Courts generally disfavor selective subordination. However, by contract, a person can make his or her priority inferior to another, and courts can give legal effect to the senior user's intention to make his priority inferior in this regard. *See Perdue v. Fort Lyon*, 184 Colo. 219, 223, 519 P.2d 954, 956 (1974).

We agree with the water court that Arapahoe is not entitled to the benefit of the subordination agreement because of its proposed transbasin uses, and therefore we find it unnecessary to consider if BUREC has consented to increase the subordination beyond 60,000 acre-feet.

b. MARKETABLE POOL

■ The marketable pool represents water that could be available for beneficial use by other water users. The original decrees adjudicate the full amount of water to the United States for a number of decreed purposes, and BUREC has been using the full amount for those decreed purposes since the issuance of the decrees.

The 1922 and 1948 Compacts allocate a certain amount of the exclusive beneficial consumptive use of the waters of the Colorado River System in perpetuity to Colorado. *See* § 37–61–101, article II(a), 10 C.R.S. (2000); § 37–62–101, article III(a)(2), 10 C.R.S. (2000). Under the Compacts, Colorado's apportioned Colorado River water may be used anywhere within the boundaries of the state. *See* § 37–61–101, article III(a); Interior Solicitor's Opinion, M. 28389 (Apr. 4, 1936).

Counsel for the State of Colorado stated to this court during oral argument:

> The marketable yield pool is water that is currently being used for hydropower. In the future, they can sell it off and use it for other purposes. It could be diverted over the hill. It could be diverted upstream and it wouldn't affect the economic feasibility of the unit.

This characterization of the marketable pool in no way defeats the intent of the Compacts. First, the storage and release of water from the Aspinall Unit for Compact delivery purposes aids Colorado in meeting

---

19. The agreement contemplated five cooperating projects: Fruitland Mesa Unit, Ohio Creek Unit, East River Unit, Tomichi Unit, and the Upper Gunnison Basin Project. However, other projects could be substituted into the plan. *See* H.R. Doc. No. 201, at 15 (1959).

its Compact obligations, thereby benefiting the state's water users. Second, the commitment of the United States to make the marketable pool available for uses within Colorado will serve the CRSPA purpose of aiding the state's use of its Compact apportionment. Third, by enforcing the Aspinall absolute decrees as we would any other absolute decree, we clarify that the water rights of the United States carry the same benefits and responsibilities as all other decreed water rights. *See Simpson v. Highland Irrigation Co.,* 917 P.2d 1242, 1252 (Colo.1996).

Cities are able to project their reasonable future water needs and secure those uses through judicial decrees. *See City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 40–41 (Colo.1996). Similarly, with the marketable pool, the United States has identified water that it can make available for consumptive uses within Colorado. The use of this pool can appropriately turn on requests being made to the United States for contracts. The reasoning is simple: the United States is currently using the water for largely nonconsumptive uses, with a commitment to deliver the water to meet Compact obligations as necessary. The decrees formalize that entitlement. BUREC has calculated that with reengineering it could contract away 240,000 acre-feet of water to consumptive uses without abridging its commitment. Arapahoe County cannot defeat the intended operation of this marketable pool in priority by (1) assuming that the United States will not make this water available for the decreed consumptive purposes of the Aspinall Unit; and (2) asserting an independent right to use it outside of a contract with the United States for its use. *See City & County of Denver v. United States,* 935 F.2d 1143, 1150–51 (10th Cir.1991).

The water court made a factual finding that Aspinall's marketable pool consisted of 240,000 acre-feet of water available for consumptive use. BUREC currently uses this water for multiple decreed purposes, and has contracted with others for only a small fraction of the total available marketable pool.

The United States conceded on oral argument that both the Eastern and Western Slopes could use this pool beneficially through reoperation of the reservoir. Specifically, counsel for the United States summarized the marketable pool concept as follows:

If [the 240,000 acre-foot marketable pool] was to be used for other uses, ... [BUREC] would have to make elections and change the way the uses are allocated-after the NEPA process and all other environmental laws were complied with-and would most likely ... [mean] that the hydropower waters would be lessened. The marketable yield is a pool sitting there for use by anybody in Colorado, [including] transbasin diversion.... The project was built by [BUREC] to make water available and they have to pay for it. The 60,000 subordination was for the Western Slope, as Judge Brown stated exhaustively, [and] was meant to be restricted to in-basin use-juniors only, with a contract-and is compensatory for the local impact of that huge project.

Section 620c of CRSPA authorizes BUREC to enter into both irrigation and municipal contracts with water users. *See* 43 U.S.C. § 620c (1994). The beneficial uses listed in the Aspinall Unit's final decree, Case No. 80CW156, include domestic and municipal uses. Therefore, although Arapahoe may not obtain a separate appropriation of the waters already decreed to the Aspinall Unit, Arapahoe may seek a contract with BUREC to use the water for municipal purposes.[20] *See in re Estes Park,* 677 P.2d 320, 327 (1984); *Merrick v. Ft. Lyon Canal Co.,* 621 P.2d 952, 955 (Colo.1981).

## C. TAYLOR PARK RESERVOIR

■ Taylor Park Reservoir (Taylor Park), an on-stream reservoir located on the Taylor River, lies upstream from the Aspinall Unit. The United States owns and operates Taylor Park for the benefit of the Uncompahgre Valley Water Users Association (UVWUA), which irrigates approximately 70,000 acres of land with water stored there. The UVWUA diverts water from the Gunni-

---

20. In order to enter into a contractual agreement with BUREC, Arapahoe must comply with feder-

al requirements.

son River and into the Uncompahgre Valley for irrigation via the Gunnison tunnel. The UVWUA obtained a 111,260 acre-feet absolute decree for Taylor Park in 1941, with priority dated August 3, 1904. The UVWUA then transferred those water rights to the United States. The Gunnison District obtained an additional absolute decree on September 18, 1990 for 44,700 acre-feet and a conditional decree for 61,530 acre-feet to refill Taylor Park Reservoir.

Arapahoe argues that the water court wrongly accepted Opposers' modeling of the Taylor Park Reservoir's first and second fills. Arapahoe contends that diversion through the Gunnison Tunnel for irrigation of the Uncompahgre Valley has averaged 21,381 acre-feet per year. Yet, Arapahoe states, the court adopted first fills more than four times greater than historic diversions for irrigation. The water court found that Arapahoe failed to follow the accounting conditions established in *In re Applications for Water Rights of the Upper Gunnison River Water Conservancy District*, 838 P.2d 840, 847 (Colo.1992). We agree with the water court.

BUREC and the UVWUA entered into an exchange agreement in 1972 to assure that the reservoir could benefit the UVWUA while improving the fish and wildlife conditions on the stretch of river between Taylor Park and Blue Mesa. The second of two agreements, the 1975 Taylor Park Reservoir Operation and Storage Exchange Agreement (the 1975 Agreement), contemplated coordinated releases between the two reservoirs to stabilize the fish population and improve fishing conditions.

The 1975 Agreement provided for a specific range of releases from Taylor Park during the year to promote spawning, fry habitat, adult habitat, and flushing needs. Because these releases often exceeded the reservoir's inflows, the 1975 Agreement allowed the UVWUA to receive a credit in Blue Mesa to the extent that the quantity of water in Taylor Park and the credit in Blue Mesa did not exceed Taylor Park's capacity. The United States and the UVWUA also agreed to allow the Gunnison District and the River District to participate in the decisions affecting fish

and wildlife, recreation, and supplemental irrigation.

The four parties to the 1975 Agreement reached a supplemental agreement in 1990 (the 1990 Agreement). In it, the Gunnison District agreed to assign to the United States any water decrees it held pursuant to applications the Gunnison District had filed under the 1975 Agreement. The 1990 Agreement also provided for reservoir accounting procedures that limited carryover of the Taylor Park first fill in Blue Mesa.

The Gunnison District applied for additional water rights for Taylor Park in Case Nos. 86CW202 and 86CW203. The first application sought to add beneficial uses for fishery and recreation to the 1941 irrigation decree. In Case No. 86CW203, the Gunnison District attempted to obtain a second fill right for Taylor Park matching its active capacity of 106,230 acre-feet. The water court denied the expansion of the 1941 decree, but granted the second fill request. On September 18, 1990, the water court entered an absolute decree for 44,700 acre-feet and a conditional decree for the balance of the reservoir's capacity for the aforementioned beneficial uses. The water court also established accounting conditions to track the movement of water between the reservoirs. We affirmed the accounting conditions in *Water Rights of the Upper Gunnison*, 838 P.2d at 856.

Arapahoe complains that the accounting conditions do not accurately reflect historic use and allow BUREC to increase the amount of water passing through Taylor Park for uses other than the original decreed use. We resolved this issue in *Water Rights of the Upper Gunnison* and Arapahoe may not contest our decision in this case. Arapahoe challenged the accounting conditions there, and renews its challenges now. The doctrines of collateral estoppel and res judicata bar relitigation of this issue and claim. *See City & County of Denver v. Consolidated Ditches Co. of Dist. No. 2*, 807 P.2d 23, 32 (Colo.1991).

In *Water Rights of the Upper Gunnison*, we recognized the November 1 date as representing the generally accepted start date for the administrative water year. *See* 838 P.2d at 852. Additionally, we found that the ac-

counting principles accurately reflected the use of the river for decreed purposes. *See id.* Arapahoe's failure to abide by the conditions in its modeling of available water places its water availability calculations in doubt. Thus, the water court did not err in finding that Opposers' experts provided a more reliable analysis of Taylor Park's historical use of water.

As a result of the water court's holding, Taylor Park alone places extreme limitations on the Gunnison River's water availability. Absent subordination for transbasin use by BUREC or a contract with BUREC, Taylor Park's and Aspinall's senior water rights, in combination, preclude diversion of water above Taylor Park into the Union Park Project.

### D. REQUIREMENT OF PERMIT TO SATISFY "CAN AND WILL" DOCTRINE

██ Arapahoe also disputes the water court's dismissal of Arapahoe's claim for a conditional water right for its pumping plant at Taylor Park for lack of an existing permit. Arapahoe first argues that the water court improperly decided this factual question under C.R.C.P. 56(h). Second, Arapahoe contends that the dismissal conflicts with the burden of proof established in this case to address permitting issues. Finally, Arapahoe argues that the water court's decision conflicts with our prior case law. Arapahoe contends that the court should allow Arapahoe to present evidence supporting its ability to obtain the requisite permits for the proposed diversion site.

Opposers argue that the water court applied the "can and will" doctrine properly when it concluded Arapahoe failed to prove the feasibility of acquiring a permit to pump water from Taylor Park. Consequently, Arapahoe failed to prove that it "can and will" complete the Taylor Park pumping plant. The water court reached this decision because Arapahoe's proposed use of the Taylor Park Reservoir would disrupt decreed rights and would require a major operational change of the reservoir to continue meeting its designed purposes. Arapahoe offered little evidence to prove that the United States and the UVWUA would grant a permit in light of the significant changes that would have to be made to the reservoir's operations. *C.f. FWS Land & Cattle Co. v. State Div. of Wildlife*, 795 P.2d 837, 839–40 (Colo. 1990). Therefore, we uphold the water court's decision that Arapahoe did not meet the "can and will" requirements.

### E. CONDEMNATION OF WATER RIGHTS THROUGH EMINENT DOMAIN

Arapahoe also argues that the water court improperly refused to allow it to show water availability at locations Arapahoe seeks to condemn for diversion purposes. Arapahoe states that section 30–20–402(1)(a), 9 C.R.S. (2000), grants it the power to acquire, through eminent domain, water facilities beyond its county boundaries. Arapahoe includes water rights in its definition of "water facilities," and cites *City of Thornton v. Farmers Reservoir & Irrigation Co.*, 194 Colo. 526, 575 P.2d 382 (1978), in support of its position. In *Farmers Reservoir*, we held that "[i]t is inconceivable to us that 'water works' do not include 'water rights' or that water and water rights are not 'required' to operate 'water works.'" *Id.* at 389–90. Arapahoe suggests that we should apply the same analysis to "water facilities."

Opposers argue that Arapahoe's departure from sponsorship of the Project as a result of the formation of the Union Park Water Authority moots the issue. Opposers first contend that Phase One of the trial examined the availability of unappropriated water, not condemnable water rights. Second, Opposers argue that Arapahoe has no power to condemn water rights. Finally, Opposers claim that even if Arapahoe may condemn water rights its failure to comply with the Water Rights Condemnation Act precludes condemnation.

We do not reach the condemnation issues because our holding that insufficient unappropriated water remains available for the Project renders this issue moot.

### F. WITNESS TESTIMONY

██ Arapahoe also argues that the water court should not have allowed the Executive

Director of the Colorado Department of Natural Resources, James Lochhead, to testify as an expert because the trial court endorsed him as merely a limited fact witness. Arapahoe asserts that we should reverse the water court's decision based on this issue alone because the water court relied heavily on Mr. Lochhead's testimony.

Nine days after Arapahoe deposed Mr. Lochhead, and slightly more than one month prior to the scheduled October 20, 1997 trial starting date, the State Engineer and several other Opposers filed a supplemental disclosure indicating that Mr. Lochhead would testify about additional issues. Those Opposers did not endorse Mr. Lochhead as an expert. Arapahoe objected immediately. On October 9, 1997, eleven days prior to trial, the parties argued the issue to the water court. The water court ordered the State to cure any problems by filing an expert report, which the water court received on the first day of trial. The water court allowed Mr. Lochhead to testify regarding several critical trial issues because Arapahoe had enough notice to prepare for his trial testimony.

Arapahoe argues that even a literal interpretation of the pre 1995 version of C.R.C.P. 16(a) prevents a witness from expanding the breadth of testimony when the testimony subjects the adversary to prejudice. We disagree. A trial court has great discretion in ruling on matters such as this, and unless it clearly abused its discretion, we will not second-guess the court's finding. *See Getty Oil,* 997 P.2d at 561. Arapahoe fails to convince this court that it suffered prejudice. Accordingly, we uphold the water court's decision to allow Mr. Lochhead's testimony.

## IV. CROSS APPEAL

 The cross-appeal concerns a stipulation agreement between Crystal Creek Homeowners' Association and NECO. The cross-appellants assert that the water court should determine the availability of water to the Union Park Project in relation to the demands of downstream senior water rights, including certain minimum streamflow rights in the Taylor River decreed in Case No. W–1991 (the W–1991 Rights), with a 1910 appropriation date. The W–1991 Rights require

the maintenance of a minimum flow in the Taylor River below Taylor Park Dam.

Arapahoe contends that the owner of the W–1991 Rights cannot place a call that would curtail diversions by Arapahoe's proposed Union Park Project because of a stipulation incorporated into the conditional decree for Union Park's hydroelectric component in Case No. 82CW340. The stipulation provides for significant stream flow requirements below the Taylor Park Reservoir on a year round basis as a condition that the W–1991 Rights holders not exercise their senior right. Opposers argue that, when calculating available water in this case, the water court should have applied the stipulation only to a use of water for power generation, not for the transmountain diversion of water.

 We find this question moot in view of our holding that the Gunnison River Valley has insufficient available water for the Project. As a general rule, when issues presented in litigation become moot, this court will decline to render a written opinion on the merits of an appeal. *See Hunt v. State Dep't of Corrections,* 985 P.2d 651, 653 (Colo. 1999). This court acknowledges two exceptions to the mootness doctrine. First, we may resolve an otherwise moot case if the matter is one "capable of repetition, yet evading review." *Humphrey v. Southwestern Dev. Co.,* 734 P.2d 637, 639 (Colo.1987). Second, we may hear a moot issue if "the matter involves a question of great public importance or an allegedly recurring constitutional violation." *Id.* Because this question does not fall within either of the exceptions, we decline to comment on the issue.

## V. CONCLUSION

In conclusion, we hold that the water court properly applied the "can and will" doctrine in determining the amount of water available for appropriation by Arapahoe in the Gunnison River Basin.

We agree with the water court that Congress intended CRSPA to serve as a mechanism for Upper Basin States to develop their water resources and still meet Compact obligations. CRSPA projects allow Colorado to develop its water resources while ensuring

that adequate water remains in storage to help meet the Compact obligations in dry years. Historically, BUREC has applied the water afforded by the Aspinall Unit decrees to full beneficial use through hydropower generation, flood control, fish and wildlife, and recreation purposes. Therefore, Arapahoe may not appropriate the Aspinall Unit water for its own use. We find that the water court's decision also correctly implemented Congress's intent to subordinate 60,000 acre-feet to in-basin water users while providing a 240,000 acre-foot marketable pool for contractual use by future in-basin and transbasin water users.

Furthermore, we hold that the water court properly determined the limitations the Taylor Park Reservoir places on the availability of water in the Gunnison River Basin. Although Arapahoe disputes the accounting conditions used by the water court to reach its conclusion, the doctrines of collateral estoppel and res judicata prevent Arapahoe from relitigating these conditions.

We also find that the water court correctly dismissed Arapahoe's claim for a conditional water right for its pumping plant at Taylor Park because Arapahoe lacked an existing permit. Without a permit, Arapahoe could not meet the "can and will" requirements for a conditional decree. Additionally, we find that Mr. Lochhead's testimony regarding the Project did not unduly prejudice Arapahoe.

Finally, we hold that both the condemnation issue and the cross-appeal are moot given our holding that insufficient unappropriated water remains available for the Project. Accordingly, we affirm the water court's judgment.